LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM and U.F.C.W. Local 1776 & Participating Employers Pension Fund, Plaintiffs,

v.

David PYOTT, Herbert W. Boyer, Louis J. Lavigne, Gavin S. Herbert, Stephen J. Ryan, Leonard D. Schaeffer, Michael R. Gallagher, Robert Alexander Ingram, Trevor M. Jones, Dawn E. Hudson, Russell T. Ray, and Deborah Dunsire, Defendants,

and

Allergan, Inc., Nominal Defendant.

C.A. No. 5795–VCL.

Court of Chancery of Delaware.

Submitted March 29, 2012.

Decided June 11, 2012.

Pamela S. Tikellis, Robert J. Kriner, Jr., Scott M. Tucker, Chimicles & Tikellis LLP, Wilmington, Delaware; Scott R. Shepherd, Shepherd, Finkelman, Miller & Shah, LLP, Media, Pennsylvania; Lesley E. Weaver, Shepherd, Finkelman, Miller & Shah, LLP, San Francisco, California; Jeffrey W. Golan, Lisa M. Lamb, Barrack, Rodos & Bacine, Philadelphia, Pennsylvania, Attorneys for Plaintiffs.

Kenneth J. Nachbar, Shannon E. German, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Wayne W. Smith, Jeffrey H. Reeves, Kristopher P. Diulio, Gibson, Dunn & Crutcher LLP, Irvine, California, Attorneys for Defendants.

Cathy L. Reese, Jose P. Sierra, Joseph B. Warden, Fish & Richardson P.C., Wilmington, Delaware, Attorneys for Nominal Defendant Allergan, Inc.

## OPINION

LASTER, Vice Chancellor.

On September 1, 2010, Allergan, Inc. entered into a settlement with the United States Department of Justice pursuant to which Allergan pled guilty to criminal misdemeanor misbranding and paid a total of $600 million in civil and criminal fines. Various specialized plaintiffs' law firms quickly filed derivative actions in both this Court and in the United States District Court for the Central District of California (the "California Federal Court").

Litigation proceeded in both courts. The California Federal Court initially dismissed a consolidated complaint pursuant to Rule 23.1 without prejudice, then later dismissed an amended and consolidated complaint pursuant to Rule 23.1 with prejudice (the "California Judgment"). Meanwhile, I postponed briefing on the defendants' motions to dismiss to accommodate the efforts of one stockholder, U.F.C.W. Local 1776 & Participating Employers Pension Fund ("UFCW"), to obtain books and records using Section 220 of the General Corporation Law, 8 *Del. C.* § 220. UFCW subsequently intervened in this action, and the plaintiffs jointly filed an 84–page, 241–paragraph Verified Second Amended Derivative Complaint dated July 8, 2011 (the "Complaint").

The defendants have moved to dismiss the Complaint. First, they say that the California Judgment mandates dismissal with prejudice under the doctrine of collateral estoppel. Second, they say that even if reviewed independently, the Complaint fails to plead demand futility under Rule 23.1. Third, they say that the Complaint fails to state a claim under Rule 12(b)(6). I reject these arguments and deny the defendants' motions.

## I. FACTUAL BACKGROUND

The facts for purposes of the motions to dismiss are drawn from the Complaint and the documents it incorporates by reference. The incorporated documents include publicly available information, such as a government sentencing memorandum, and non-public books and records that UFCW obtained by using Section 220, such as Allergan's internal board-approved strategic plans and warning letters from the U.S. Food and Drug Administration (the "FDA"). The Complaint contains numerous particularized factual allegations from which inferences reasonably could be drawn in favor of either the plaintiffs or the defendants. At this stage of the case, the plaintiffs receive the benefit of all reasonable inferences.

### A. Allergan And The Growth Of Botox

Nominal defendant Allergan is a Delaware corporation that develops and commercializes specialty pharmaceuticals, biologics, and medical devices. Allergan's stock trades on the New York Stock Exchange under the symbol "AGN." The twelve individual defendants comprised Allergan's board of directors (the "Board") at the time this action was initiated. Defendant Pyott has served as Allergan's CEO since 1998 and as Chairman of the Board since 2001. Defendants Boyer, Gallagher, Herbert, and Schaeffer have served as outside directors since before 2000. Defendants Ryan, Ray, and Jones joined the board as outside directors in 2002, 2003, and 2004, respectively. Defendants Lavigne and Ingram joined the board in 2005. Defendants Dunsire and Hudson joined the board in 2006 and 2008, respectively.

Allergan manufactures Botox, a drug widely known for its muscle-relaxing properties. The trade name derives from its active ingredient, the neurotoxin botulinum toxin type A. The government settlement and this opinion address only Botox Therapeutic; they do not address its better-known sibling, Botox Cosmetic, which has its own FDA-approved label and drug code.

The FDA first approved Botox for therapeutic use in 1989 for treating two eye muscle disorders: strabismus (crossed eyes) and blepharospasm (abnormal spasm of the eyelids). In December 2000, the FDA approved Botox for treating pain associated with cervical dystonia (involuntary neck muscle contraction). In July 2004, the FDA approved the product for treating severe primary axillary hyperhidrosis (underarm sweating). Not until 2010 would the FDA approve two additional treatments: upper-limb spasticity (approved in March 2010) and migraine headaches (approved in October 2010).

A small market existed for the limited Botox uses approved by the FDA before 2010. Treating physicians, however, were not limited to FDA-approved applications. In the United States, a physician may prescribe an approved pharmaceutical product for any use, including uses not approved by the FDA. Prescribing a pharmaceutical product for an FDA-approved use is referred to as "on-label" use; prescribing the same product for an unapproved use is referred to as "off-label" use. " 'Off-label use is widespread in the medical community and often is essential to giving patients optimal medical care, both of which medical ethics, FDA, and most courts recognize.' " *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 n. 5, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (quoting James M. Beck & Elizabeth D. Azari, *FDA, Off–Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71, 72 (1998)).

Because a physician legally can prescribe a product for off-label use, a manu-

facturer legally can sell a product notwithstanding its potential off-label use. It is *illegal,* however, for a manufacturer to *market* a drug for off-label use. Under the Food, Drug, and Cosmetics Act, 21 U.S.C. §§ 301 *et seq.,* the Public Health Service Act, 42 U.S.C. §§ 262 *et seq.,* and their implementing regulations, drug manufacturers cannot market or promote drugs for uses that the FDA has not approved. *See, e.g.,* 21 U.S.C. § 331(a), (d); 42 U.S.C. § 262(a)(1), (b); 21 C.F.R. § 601.12.

Allergan understood the critical distinction between off-label sales and marketing. Allergan's 2004 Annual Report summarized the regulatory scheme as follows:

> Physicians may prescribe pharmaceutical and biologic products for uses that are not described in a product's labeling or differ from those tested by us and approved by the FDA. While such "off-label" uses are common and the FDA does not regulate a physician's choice of treatment, the FDA does restrict a manufacturer's communications on the subject of off-label use. Companies cannot actively promote FDA-approved pharmaceutical or biologic products for off-label uses.... If ... our promotional activities fail to comply with the FDA's regulations or guidelines, we may be subject to warnings from, or enforcement action by, the FDA or another enforcement agency.

This derivative action arises out of Allergan's failed efforts (as demonstrated by the guilty plea and government settlement) to walk the fine line between off-label sales and off-label marketing.

**B. Allergan Provides Extensive Support For Off–Label Sales.**

Allergan strongly advocated expanded uses for Botox and supported off-label Botox sales with a phalanx of initiatives. The company sponsored Botox seminars and presentations about off-label uses, founded and financed organizations that advocated off-label uses, provided support services for physicians seeking reimbursement for off-label uses, and lobbied government healthcare programs to expand reimbursement for off-label uses. Allergen CEO Pyott was such a vocal advocate for the drug that he earned the nickname "Mr. Botox."

Most importantly, Allergan cultivated relationships with physicians, a strategy it considered critical to increasing off-label Botox use. Allergan instituted a Physician Partnership Program in which it paid selected physicians to be travelling mentors to promote Botox use among their peers, and it funded physician "preceptorships" in which Allergan personnel shadowed participating physicians. Allergan monitored physician prescription writing, identified those doctors who prescribed high levels of Botox, and recruited them for its Physician Partnership Program. Allergan also funded continuing medical education programs, seminars, and promotional dinners. In 2006 alone, the company sponsored more than 1,200 physician speaker programs.

Allergan recognized that growth in off-label Botox use largely depended on physicians receiving reimbursement from healthcare programs. To facilitate reimbursement, Allergan employed Provider Reimbursement Account Managers to counsel physicians concerning off-label Botox prescriptions. The Provider Reimbursement Account Managers audited physician billing records and reviewed the payments physicians received to assist in maximizing reimbursement for off-label use. Allergan maintained a physician-assistance hotline that doctors could call for additional off-label reimbursement advice and billing assistance. To provide a financial incentive for physicians to write more

off-label prescriptions despite reimbursement limitations, Allergan implemented a Temporary Price Allowance Program. This program gave selected physicians below-invoice discounts to create a profitable spread between the physician's acquisition cost and the Medicare reimbursement rate. Allergan's written strategic plan for 1997–2001 cited the "U.S.-Reimbursement assistance" program as one of the reasons *Why Customers Buy From Us Now.*" German Aff. Ex. D, Written Plan, at 59 [hereinafter the Written Plan].

Allergan also financed a number of organizations to support off-label Botox use. Mitchell Bren, Allergan's chief scientific officer for Botox, founded WE MOVE, the Worldwide Education and Awareness for Movement Disorders Organization. WE MOVE distributed medical literature to physicians that provided dosing guidelines for off-label uses, including a "Suggested Pediatric BOTOX® Dosing" manual. Allergan also funded the Neurotoxin Institute, an on-line organization that disseminated information about off-label Botox uses. Although funded by Allergan, the Institute described itself on its website as "a multidisciplinary organization created to serve as a comprehensive *independent* source of information related to the basic science and the clinical applications of neurotoxins." Compl. ¶ 78 (emphasis added; internal quotation omitted). Allergan financed another entity, the Alliance for Patient Access, whose mission was to reduce coverage barriers to reimbursement for off-label Botox uses.

## C. The Board Approves And Oversees The Strategic Plan.

The Allergan Board played an active role in planning and monitoring the growth of Botox, which was one of the company's most promising products. From at least 1997, the Board discussed and approved a series of annual strategic plans that sought to expand off-label Botox sales. A slide deck summarizing the 1997–2001 Strategic Plan listed "BOTOX—Spasticity, migraine, and pain" as one of Allergan's "Top Corporate Priorities." German Aff. Ex. D, Plan Slides, at 10 [hereinafter the Plan Slides]. At the time, those uses were not approved by the FDA. The slides further noted that Botox "represent[s] immediate growth" for Allergan and that the "[e]xpansion strategy enables Allergan to maximize ... BOTOX® *now.*" *Id.* at 11. The plan noted that Botox would enable Allergan to compete in the "pain market" and "migraine headache market," which were estimated to grow to a combined $6 billion by 2007. Written Plan at 3. The plan described Botox as having "tremendous growth potential as we fund opportunities ... such as spasticity, pain, migraine, and tension headache." *Id.* Each remained an off-label use until at least 2010.

The Board regularly monitored Botox sales. For example, at a September 2002 Board meeting, Pyott "reviewed BOTOX® growth in average daily sales." Compl. ¶ 15. At a July 2003 Board meeting, Pyott "discussed BOTOX® sales growth over last 12 months, the then-current sales mix of BOTOX® Therapeutic (58%) v. BOTOX® Cosmetic (42%), intra-therapeutic growth rates for BOTOX®, and BOTOX® capacity utilization and scenarios." *Id.*

## D. Government Scrutiny Of Allergan's Botox Programs

Allergan first drew government scrutiny for its Botox initiatives on August 22, 2001, when Allergan received a warning letter from the FDA. The letter noted that the FDA had "reviewed [Allergan] promotional activities and materials and has concluded that they are misleading and lacking in fair balance...." German Aff. Ex. F. The letter requested that Allergan take

"prompt action to correct . . . violations like those outlined in this letter." *Id.* Allergan received a warning letter addressing misleading advertising for Botox Cosmetic in June 2003. German Aff. Ex. G.

Despite the FDA warnings, Allergan continued to drive Botox sales, which increased rapidly. Between 2000 and 2004, net sales of Botox grew between 25% and 42% annually, despite being approved by the FDA for only four limited uses. Compl. ¶ 53. Off-label sales skyrocketed. Between 1999 and 2006, spasticity sales grew by 332%; headache sales grew by 1,407%; and pain sales grew by 504%. *Id.* ¶ 12. By 2005, Botox accounted for 33% of Allergan's total net sales. *Id.* ¶ 170.

### E. The Schim Incident

On September 21, 2006, the FDA sent a letter to Allergen concerning off-label marketing during a presentation by an Allergan-sponsored speaker, Dr. Jack Schim. Dr. Schim is the co-director of the Headache Center of Southern California and was a frequent participant in Allergan's sponsored-physician speaker program.

On October 24, 2006, Allergan's General Counsel Douglas S. Ingram advised the Board by email about the FDA inquiry. Ingram noted that Dr. Schim's speech "contained a large volume of information on the use of Botox for the treatment of headache," which was an off-label use at the time. German Aff. Ex. E. Ingram reminded the directors that the dinner programs were "directly funded, hosted, and controlled by Allergan" and that "the presentations are considered commercial promotion and Allergan is responsible for their content." *Id.* Ingram reported that

[u]pon our internal investigation into this dinner meeting, it was discovered that Dr. Schim had been provided the approved . . . slide deck but had, instead, used another deck of slides that were not approved [by Allergan]. . . . These slides, many of which presumably came from continuing medical education events, contained some information about the mechanism of action of Botox and some information on the use of Botox for the treatment of cervical dystonia. However, the deck also contained a large volume of information on the use of Botox for the treatment of headache. *Moreover, we have discovered that there were a total of 8 such dinner meetings over the last 12 months at which Dr. Schim presented these or similar slides.*

*Id.* (emphasis added).

Ingram advised the Board that "[i]t appears that the primary basis for this failure to comply with policy related to a perceived lack of responsibility within the sales and marketing organization." *Id.* According to Ingram, "[t]he sales representative and sales manager knew or should have known that [unapproved] slides were being used but apparently did not believe it was their responsibility to ensure that only [approved] slides were being used, as they were not part of the approval process for the slide decks." *Id.* Ingram warned that "[t]his is a potentially serious matter and in the current environment, the chance of receiving Agency action, including but not limited to a Warning Letter, on this matter is in my opinion very high." *Id.*

### F. The Board Approves The 2007–2011 Strategic Plan And Off–Label Botox Sales Continue To Grow.

After the Schim incident, the Board continued to authorize aggressive efforts to increase Botox sales. For example, the Board approved Allergan's 2007–2011 Strategic Plan, which explicitly linked the number of sales representatives, or Neuroscience Medical Consultants ("NMCs"), to increased off-label sales. Compl. ¶ 176

(noting that in "2006 [Allergan] Added 45 New NMCs & Spasticity grew 25%, and that in 2007, Allergan Added 19 New NMCs & Spasticity Est[imated] 18%" (alterations in original) (internal quotation omitted)). By February 2008, Allergan had nearly tripled the payroll for its Botox sales force relative to February 2003.

During the same period, the Board received detailed reports on Botox sales. For example, management presented the Board with a 2007 Customer Survey that showed U.S. Botox sales figures for on-label and off-label uses. By 2007, annual Botox sales for therapeutic uses totaled nearly $600 million, with 70–80% generated by off-label use.

## G. The Government Settlement

On September 1, 2010, Allergan entered into a settlement with the United States Department of Justice. The settlement followed a three-year joint investigation of Allergan's off-label marketing practices by the Federal Bureau of Investigation, the FDA's Office of Criminal Investigation, and the Department of Health and Human Services, Office of Inspector General. Under the terms of the settlement, Allergan agreed to plead guilty to criminal misdemeanor misbranding for the period from 2000 through 2005 and pay criminal fines of $375 million. Allergan also agreed to pay an additional $225 million in civil fines to resolve False Claims Act lawsuits which alleged similar off-label marketing claims. The $600 million penalty equaled 96% of the company's reported net income in 2009 and exceeded both its 2007 and 2008 net income.

As part of the settlement, Allergan entered into a five-year Corporate Integrity Agreement with the Department of Health and Human Services, Office of Inspector General. The agreement mandates that Allergan implement a strict compliance program, notify physicians of the government settlement, and post information on payments to physicians on the company's website.

## H. The Derivative Actions

The public announcement of the settlement on September 1, 2010, prompted plaintiffs' firms who specialize in stockholder representative litigation to rush to the courthouse. For reasons described below, this unfortunate behavior reflects understandable choices made by these rational economic actors given the incentives currently created by our legal system. *See infra* Part II.A.3.

On September 3, 2010, Louisiana Municipal Police Employees' Retirement System ("LAMPERS") filed this action. The original complaint relied solely on the Allergan press release and other publicly available information. Given the short time frame involved, counsel had minimal opportunity to investigate the claims. Nor could counsel have evaluated meaningfully whether or not a sufficient number of Allergan directors were disabled such that the Board was not the appropriate corporate actor to address the fallout from the government investigation.

Between September 9 and 24, 2010, other specialized stockholder plaintiffs' firms filed similar derivative actions in the California Federal Court. *See Rosenbloom v. Pyott*, No. SACV10–01352–DOC; *Himmel v. Pyott*, No. SACV10–01417–JVS; *Pompano Beach Police & Firefighters' Ret. Sys. v. Pyott*, No. SACV10–01449–DOC. On October 25, the California Federal Court consolidated the cases. *See In re Allergan Inc. S'holder Deriv. Litig.*, Case No. SACV10–01352–DOC, 2011 WL 1429626. One stockholder plaintiffs' firm sent Allergan a litigation demand. *See* Dkt. 19, Ex. D.

On October 11, 2010, LAMPERS filed its first amended complaint in this action. The amended complaint contained additional detail drawn from publicly available materials. The principal sources were the False Claims Act complaints filed against Allergan in 2007, 2008, and 2009, a sentencing memorandum filed by the Department of Justice on October 4, 2010, in support of its settlement and plea agreement with Allergan, and the plea agreement itself, which was filed on October 5. The amended complaint cribbed from these documents. Allergan and the defendant directors moved to dismiss the amended complaint pursuant to Rules 23.1 and 12(b)(6).

On November 3, 2010, UFCW sent Allergan a Section 220 demand for books and records. On November 30, UFCW moved to intervene in this action. LAMPERS joined the defendants in vehemently opposing the motion to intervene. Rather than welcoming UFCW as a litigation partner and potential source of information to craft an even better complaint, LAMPERS attacked UFCW in an effort to maintain control over the case. LAMPERS' opposition maligned UFCW's efforts as "indefensible" and "serv[ing] only to unduly delay the adjudication of the rights of the original parties, while providing absolutely no benefit to Allergan, Inc." Dkt. 37, Opp'n Mem. 1–2. In doing so, LAMPERS seemed oblivious to the Delaware courts' repeated exhortations that plaintiffs use Section 220 before filing derivative actions, as UFCW was doing, or that defendants regularly prevail when moving to dismiss hastily filed derivative complaints prepared without the benefit of books and records. *See infra* Part II.A.3.

On January 21, 2011, I denied the motion to intervene without prejudice as prematurely filed, but postponed any hearing on the motions to dismiss "until after the 220 process is over." *La. Mun. Police Empls. Ret. Sys. v. Pyott*, C.A. No. 5795–VCL, at 56–57, 2011 WL 283303 (Del.Ch. Jan. 21, 2011) (TRANSCRIPT). LAMPERS and UFCW then reached an accommodation permitting both to serve as co-plaintiffs. After pressing forward with its Section 220 demand, UFCW eventually obtained documents. The Delaware plaintiffs jointly filed the Complaint on July 8. The defendants moved to dismiss on July 15.

Meanwhile, in the California Action, the California Federal Court dismissed the plaintiffs' first complaint without prejudice on April 12, 2011. The California plaintiffs asked Allergan for the Section 220 production, and Allergan shared it. The California plaintiffs subsequently filed an amended complaint that incorporated the documents Allergan provided, and the California defendants again moved to dismiss.

For reasons that are not clear to me, briefing on the motions to dismiss moved forward more quickly in California than in Delaware. On January 17, 2012, without the benefit of oral argument, the California Federal Court issued the California Judgment, a five-page order dismissing the California Action with prejudice pursuant to Rule 23.1 for failure to plead demand futility. On February 22, the California Federal Court denied a motion for reargument. The defendants then supplemented their motions to dismiss in this action to invoke collateral estoppel.

## II. LEGAL ANALYSIS

The defendants identify three bases on which they say judgment should be entered in their favor: collateral estoppel, Rule 23.1, and Rule 12(b)(6). If collateral estoppel applies, then I need not consider the others, so I start there.

A growing body of precedent holds that a Rule 23.1 dismissal has preclusive effect on other derivative complaints.[1] These cases reason that because a stockholder plaintiff in a derivative action sues in the name of the corporation, all other stockholder plaintiffs are in privity with the plaintiff in the dismissed derivative action. In my view, the answer to the privity question turns on the legal relationship between a stockholder and the corporation, which is governed by Delaware law under the internal affairs doctrine.

Controlling Delaware Supreme Court precedent makes clear that until a Rule 23.1 motion has been *denied*, a derivative plaintiff whose litigation efforts are opposed by the corporation does *not* have authority to sue in the name of the corporation. Consequently, at the time of the first Rule 23.1 dismissal, other stockholders are not in privity with the stockholder plaintiff in the first derivative action, and a decision *granting* a Rule 23.1 dismissal cannot have preclusive effect. The dismissal remains persuasive authority, but it is not preclusive.

The defendants rely on *LeBoyer*, a California collateral estoppel decision that conflicts with controlling Delaware Supreme Court authority on the effect of a Rule 23.1 dismissal. If the collateral estoppel issue were properly presented to the California Federal Court, that court should decline to follow *LeBoyer* and hold instead that collateral estoppel does not bar a later derivative action by a different stockholder.

Because the California Judgment does not have preclusive effect, I analyze the defendants' motions to dismiss pursuant to Rules 23.1 and 12(b)(6). Respectfully disagreeing with the California Federal Court, I deny the Rule 23.1 motion. With all reasonable inferences drawn in favor of the plaintiffs, as required at this procedural stage, the Complaint's particularized allegations raise a reasonable doubt that a majority of the Board could properly consider a demand. Read as a whole, the particularized allegations support a reasonable inference that the Board consciously approved a business plan predicated on violating the federal statutory prohibition against off-label marketing. "[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey." *Guttman v. Huang*, 823 A.2d 492, 506 n. 34 (Del.Ch.2003). "[I]t is generally accepted that a derivative suit may be asserted by an innocent stockholder on behalf of a corporation against corporate fiduciaries who knowingly caused the corporation to commit illegal acts and, as a result, caused the corporation to suffer harm." *In re Am. Int'l Gp., Inc., Consol. Deriv. Litig.*, 976 A.2d 872, 889 (Del.Ch.2009). The Complaint therefore pleads a non-exculpated breach of the duty of loyalty, exposes the defendants to a substantial threat of liability, and renders demand futile.

Determining that the Complaint alleges particularized facts that present a substantial threat of liability under the heightened Rule 23.1 pleading standard necessarily determines that the Complaint states a

---

1. *See, e.g., In re Sonus Networks, Inc., S'holder Deriv. Litig.*, 499 F.3d 47 (1st Cir.2007); *Arduini ex rel. Int'l Game Tech. v. Hart*, 2012 WL 893874 (D.Nev. Mar. 14, 2012); *In re Bed Bath & Beyond Inc. Deriv. Litig.*, 2007 WL 4165389 (D.N.J. Nov. 19, 2007); *Hanson v. Odyssey Healthcare, Inc.*, 2007 WL 5186795 (N.D.Tex. Sept. 21, 2007); *LeBoyer v. Green-span*, 2007 WL 4287646 (C.D.Cal. June 13, 2007); *Henik ex rel. LaBranche Co. v. LaBranche*, 433 F.Supp.2d 372 (S.D.N.Y.2006); *In re Career Educ. Corp. Deriv. Litig.*, 2007 WL 2875203 (Del.Ch. Sept. 28, 2007); *Carroll ex rel. Pfizer, Inc. v. McKinnell*, 19 Misc.3d 1106(A), 2008 WL 731834 (N.Y.Sup.Ct.2008).

claim under the more plaintiff-friendly Rule 12(b)(6) standard. That motion is therefore denied as well.

## A. Collateral Estoppel

The defendants observe that in *LeBoyer,* the California Federal Court applied collateral estoppel to hold that a California state court's dismissal with prejudice of one stockholder plaintiff's derivative action pursuant to Rule 23.1 barred a different stockholder plaintiff from suing derivatively. The defendants correctly point out that when applying collateral estoppel, this Court must give a judgment the same force and effect that it would be given by the rendering court.[2] Having obtained the California Judgment, they say I must follow *LeBoyer.* I disagree.

*LeBoyer* described collateral estoppel as having five elements:

First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding

must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

2007 WL 4287646, at *1 (quoting *In re Cantrell,* 329 F.3d 1119, 1123 (9th Cir. 2003)). In substance, *LeBoyer*'s five-part test matches shorter formulations that the California Federal Court might apply. *See, e.g., Hydranautics v. FilmTec Corp.,* 204 F.3d 880, 885 (9th Cir.2000) ("Under both California and federal law, collateral estoppel applies only where it is established that '(1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be re-litigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding.'" (quoting *Younan v. Caruso,* 51 Cal.App.4th 401, 59 Cal.Rptr.2d 103, 106 (1996))).

For purposes of this case, I need only consider privity. I need not contemplate whether a Rule 23.1 dismissal is "on the merits" for purposes of collateral estoppel.[3] Neither must I address the level of

---

**2.** *See* U.S. Const. art. IV, § 1 ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."); 28 U.S.C. § 1738 ("Acts [of the legislature of any State, Territory, or Possession of the United States and] records and judicial proceedings [of any such State, Territory or Possession] ... shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."); *Thompson v. D'Angelo,* 320 A.2d 729, 734 (Del.1974) ("We ... note that as long as the order of the [United States] District Court [for the Eastern District of Penn-

sylvania] stands it is the duty of the Courts of this State to accord it the same force and effect as would be given to it by a Pennsylvania Court."); *W. Coast Mgmt. & Capital, LLC v. Carrier Access Corp.,* 914 A.2d 636, 642 (Del.Ch.2006) ("This court gives the same preclusive effect to the judgment of another state or federal court as the original court would give.").

**3.** *Compare, e.g., Ex parte Capstone Dev. Corp.,* 779 So.2d 1216, 1218–19 (Ala.2000) (deeming a Rule 23.1 dismissal to be a decision based on a precondition and therefore not "upon the merits" for purposes of preclusive effect) *and Kaplan v. Bennett,* 465 F.Supp. 555, 561–62 (S.D.N.Y.1979) (same) *with Bed Bath & Beyond,* 2007 WL 4165389, at *6 ("A dismissal for failure to make demand on a board is considered substantive and, therefore, on the

specificity at which the "same issue" analysis operates,[4] nor ponder whether the analysis should be limited to information actually known to and alleged by the initial derivative plaintiff versus extending to information that could have been known to and alleged by the initial derivative plaintiff but were not.[5] Because the defendants only invoke collateral estoppel (*i.e.,* issue preclusion), I will not consider the more expansive doctrine of *res judicata* (*i.e.,* claim preclusion).[6]

## 1. Choice of Law

■ Whether successive stockholders are sufficiently in privity with the corporation and each other is a matter of substantive Delaware law governed by the internal affairs doctrine. *See Sonus Networks,* 499 F.3d at 64. "No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations...." *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 89, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). "Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law expressly requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation." *Cort v. Ash,* 422 U.S. 66, 84, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs— matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders...." *Edgar v. MITE Corp.,* 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); *accord VantagePoint Venture P'rs 1996 v. Examen, Inc.,* 871 A.2d 1108, 1113

merits.") *and LeBoyer,* 2007 WL 4287646, at *2 (holding that under the internal affairs doctrine, Delaware law determines whether a Rule 23.1 dismissal is "on the merits") *and Henik,* 433 F.Supp.2d. at 379 (citing federal authorities to hold that a Rule 23.1 dismissal with prejudice is a "final adjudication" and "on the merits"). *See also Sonus Networks,* 499 F.3d at 59–62 (holding that a Rule 23.1 dismissal is binding as to demand futility regardless of the meaning of "on the merits").

4.  *Compare, e.g., W. Coast Mgmt.,* 914 A.2d at 643 n. 22 (suggesting that the issue decided in the original case should be limited to the allegations supporting demand futility that were made by that derivative plaintiff) *with Bed Bath & Beyond,* 2007 WL 4165389, at *6 ("[B]ecause the prior plaintiff did not plead every possible cause of action or include every possible time period or defendant does not alter the central issue—whether demand on the BBB board would have been futile— which has already been determined by the New York court.") *and LeBoyer,* 2007 WL 4287646, at *2 ("[T]he issue here—whether a demand on the board to sue the directors over the 2003 restatement would have been futile—is the same.").

5.  *Compare, e.g., W. Coast Mgmt.,* 914 A.2d at 643 n. 22 (suggesting not giving issue preclusive effect to original complaint if subsequent complaint contains substantial additional facts developed using Section 220) *with Sonus Networks,* 499 F.3d at 62–63 (giving issue preclusive effect where facts were not alleged in original complaint but original plaintiff could have obtained the information) *and Arduini,* 2012 WL 893874, at *3 (noting that "Plaintiff's arguments that he has allegations specific to the demand futility issue that are different from the allegations brought up in [the underlying proceeding do not] preclude our use of issue preclusion").

6.  *Compare Henik,* 433 F.Supp.2d. at 381 (applying both *res judicata* and collateral estoppel to Rule 23.1 determination) *and Bed Bath & Beyond,* 2007 WL 4165389, at *8 (holding that relitigation of demand futility is precluded under the doctrine of claim preclusion) *with Sonus Networks,* 499 F.3d at 60–62 (holding that a Rule 23.1 determination only gives rise to issue preclusion and not claim preclusion).

(Del.2005) (explaining that "matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders" fall within the internal affairs doctrine); *see* Restatement (Second) of Conflict of Laws § 304 (1971) [hereinafter Conflict of Laws] (concluding that the law of state of incorporation generally should "determine the right of a shareholder to participate in the administration of the affairs of the corporation").

The United States Supreme Court has held that "the function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of 'substance,' not 'procedure,'" and is therefore governed by the internal affairs doctrine. *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 96–97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991); *accord Braddock v. Zimmerman,* 906 A.2d 776, 784 (Del.2006) ("The demand requirement of Rule 23.1 is a substantive right ....") (internal quotation omitted)); *Ainscow v. Sanitary Co. of Am.,* 180 A. 614, 615 (Del.Ch.1935) (Wolcott, Jos., C.) ("The question of whether a stockholder may act as a volunteer in taking up the cudgels in behalf of his corporation ... is one of his right and authority to act."). Whether a stockholder in a Delaware corporation can sue derivatively after another stockholder attempted to plead demand futility raises a question of demand futility law. In *Kamen,* the United States Supreme Court held that applying a universal-demand rule in federal court would disrupt the internal affairs of corporations and cautioned "against establishing competing federal—and state—law principles on the allocation of managerial prerogatives within [a] corporation." *Kamen,* 500 U.S. at 106, 111 S.Ct. 1711 (citing *Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979)). In my view, whether a stockholder can sue derivatively after another stockholder attempted to plead demand futility is equally a matter involving the managerial prerogatives within a corporation. It is therefore a matter controlled by the internal affairs doctrine and governed by the law of the state of incorporation. *See id.* at 108–09, 111 S.Ct. 1711 ("[A] court that is entertaining a derivative action ... must apply the demand futility exception as it is defined by the law of the State of incorporation."); *VantagePoint,* 871 A.2d at 1115 (following *Kamen* ).

As in *Kamen,* applying the internal affairs doctrine in this setting promotes the important objective of treating directors, officers, and stockholders uniformly across jurisdictions. *See* Conflict of Laws § 302, cmt. e ("Uniform treatment of directors, officers and shareholders is an important objective which can only be attained by having the rights and liabilities of those persons with respect to the corporation governed by a single law.").

Large corporations that are listed on national exchanges, or even regional exchanges, will have shareholders in many States and shares that are traded frequently. The markets that facilitate this national and international participation in ownership of corporations are essential for providing capital not only for new enterprises but also for established companies that need to expand their businesses. This beneficial free market system depends at its core upon the fact that a corporation—except in the rarest situations—is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation.

. . . .

It thus is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the

rights that are acquired by purchasing their shares. A State has an interest in promoting stable relationships among parties involved in the corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs.

*CTS Corp.*, 481 U.S. at 90–91, 107 S.Ct. 1637. To my mind, whether a stockholder in a Delaware corporation can sue derivatively after another stockholder attempted to plead demand futility should not be governed by potentially different rules across twelve federal circuits, fifty states, and the District of Columbia, Puerto Rico, and other territories. Applying different rules in different courts would disrupt the internal affairs of corporations. *See Kamen*, 500 U.S. at 106, 111 S.Ct. 1711. Whether a stockholder in a Delaware corporation can sue derivatively after another stockholder attempted to plead demand futility should be governed uniformly by Delaware law.

### 2. The Same Party Or A Party In Privity

■ In determining that successive stockholders were in privity for purposes giving collateral estoppel effect to a Rule 23.1 dismissal, *LeBoyer* relied on the legal truism that a derivative plaintiff sues in the name of the corporation. In the court's words, "the fifth element is satisfied in that in both suits the plaintiff is the corporation itself. The differing groups of shareholders who can potentially stand in the corporation's stead are in privity for the purposes of issue preclusion." 2007 WL 4287646, at *3. Other decisions giving preclusive effect to Rule 23.1 dismissals have reasoned similarly.[7] For example in *Sonus Networks*, the leading federal decision on Rule 23.1 preclusion, the United States Court of Appeals for the First Circuit stated:

> It is a matter of black-letter law that the plaintiff in a derivative suit represents the corporation, which is the real party in interest. Under Massachusetts law, a derivative suit is prosecuted in the right of the corporation. Standing to represent a foreign corporation is governed by the laws of the state of incorporation, and Delaware law is in accord with the prevailing rule that the shareholder in a derivative suit represents the corporation.

499 F.3d at 63–64 (citations and internal quotation omitted).

■ These cases miss that as a matter of Delaware law, a stockholder whose litigation efforts are opposed by the corporation does not have authority to sue on behalf of the corporation until there has

---

7. *See, e.g., Arduini*, 2012 WL 893874, at *3 (holding that privity was satisfied in giving preclusive effect to Rule 23.1 dismissal because "plaintiffs in a shareholder derivative action represent the corporation"); *Bed Bath & Beyond*, 2007 WL 4165389, at *7 (finding privity met for preclusive application of Rule 23.1 dismissal because "[t]he claims alleged and any proceeds from a prior action do not belong to the shareholder plaintiffs; rather, they belong to the corporation itself"); *Hanson*, 2007 WL 5186795, at *5 (holding privity existed; "because shareholder derivative suits are brought on behalf of the corporation, it follows that the corporation is bound by the results of the suit in subsequent litigation, even if different shareholders prosecute the suits" (internal quotation omitted)); *Bennett*, 465 F.Supp. at 560 (holding that successive derivative actions involved the same party for purposes of preclusive effect of Rule 23.1 dismissal because the corporation "was the real party in interest in the other suits and is so here, regardless of the nominal plaintiffs"); *Carroll*, 2008 WL 731834, at *8 (finding privity met because "there is no difference between the plaintiffs in the Pfizer Derivative MDL and plaintiff here. Each plaintiff seeks to assert claims on behalf of Pfizer, not individual claims. Thus, plaintiff is bound by the determination in that case.").

been a finding of demand excusal or wrongful refusal. In *Rales v. Blasband,* the Delaware Supreme Court addressed this issue:

> Because directors are empowered to manage, or direct the management of, the business and affairs of the corporation, the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim *and* they have wrongfully refused to do so *or* where demand is excused because the directors are incapable of making an impartial decision regarding such litigation.

634 A.2d 927, 932 (Del.1993) (emphases added; citation omitted). In *Kaplan v. Peat, Marwick, Mitchell & Co.,* the Delaware Supreme Court was equally clear:

> [P]re-suit demand under Chancery Court Rule 23.1 is an objective burden which must be met in order for the shareholder to have capacity to sue on behalf of the corporation. *The right to bring a derivative action does not come into existence until the plaintiff shareholder has made a demand on the corporation to institute such an action or until the shareholder has demonstrated that demand would be futile.*

540 A.2d 726, 730 (Del.1988) (emphasis added). Delaware Court of Chancery decisions have long expressed these same principles. *See, e.g., Ainscow,* 180 A. at 615 ("[A] stockholder has no right to file a bill in the corporation's behalf unless he has first made demand on the corporation that it bring the suit and the demand has been answered by a refusal, or unless the circumstances are such that because of the relation of the responsible officers of the corporation to the alleged wrongs, a demand would be obviously futile . . . ."); *accord Maldonado v. Flynn,* 413 A.2d 1251, 1262 (Del.Ch.1980) ("The stockholder's individual right to bring the action does not ripen, however, until he has made a demand on the corporation which has been met with a refusal by the corporation to assert its cause of action or unless he can show a demand to be futile."), *rev'd on other grounds, Zapata Corp. v. Maldonado,* 430 A.2d 779, 784 (Del.1981) ("[W]here demand is properly excused, the stockholder does possess the ability to initiate the action on his corporation's behalf.").

The derivative plaintiff's lack of authority to sue on behalf of the corporation until the denial of a Rule 23.1 motion likewise flows from the two-fold nature of the derivative suit. As the Delaware Supreme Court explained in *Aronson v. Lewis,* the seminal demand-futility decision, "[t]he nature of the [derivative] action is two-fold. First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it." 473 A.2d 805, 811 (Del.1984).[8] Later Dela-

---

8. In *Brehm v. Eisner,* 746 A.2d 244, 253–54 (Del.2000), the Delaware Supreme Court overruled seven precedents, including *Aronson,* to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *See id.* at 253 n. 13 (overruling in part on this issue *Scattered Corp. v. Chicago Stock Exch.,* 701 A.2d 70, 72–73 (Del.1997); *Grimes v. Donald,* 673 A.2d 1207, 1217 n. 15 (Del. 1996); *Heineman v. Datapoint Corp.,* 611 A.2d 950, 952 (Del.1992); *Levine v. Smith,* 591 A.2d 194, 207 (Del.1991); *Grobow v. Perot,* 539 A.2d 180, 186 (Del.1988); *Pogostin v. Rice,* 480 A.2d 619, 624–25 (Del.1984); and *Aronson,* 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Brehm,* 746 A.2d at 254. The seven partially overruled precedents otherwise remain good law. In this decision, I do

ware Supreme Court decisions repeatedly reaffirmed the two-fold nature of the derivative suit.[9] Nor was this a new concept. Half a century before *Aronson,* Chancellor Josiah Wolcott wrote:

> The complainants' case, being asserted by them in their derivative right as stockholders, has a double aspect. Its nature is dual. It asserts as the principal cause of action a claim belonging to the corporation to have an accounting from the defendants and a decree against them for payment to the corporation of the sum found due on such accounting. In this aspect, the cause of action is the corporation's. It does not belong to the complainants. Inasmuch however as the corporation will not sue because of the domination over it by the alleged wrongdoers who are its directors, the complainants as stockholders have a right in equity to compel the assertion of the corporation's rights to redress. This is their individual right. A bill filed by stockholders in their derivative right therefore has two phases—one is the equivalent of a suit to compel the corporation to sue, and the other is the suit by the corporation, asserted by the stockholders in its behalf, against those liable to it. The former belongs to the complaining stockholders; the latter to the corporation.

*Cantor v. Sachs,* 162 A. 73, 76 (Del.Ch. 1932) (citations omitted); *accord Harff v. Kerkorian,* 324 A.2d 215, 218 (Del.Ch.1974) ("The nature of the derivative suit is two-fold: first, it is the equivalent of a suit by the stockholders to compel the corporation to sue; and second, it is a suit by the corporation, asserted by the stockholders in its behalf, against those liable to it."), *aff'd in part, rev'd in part on other grounds,* 347 A.2d 133 (Del.1975). The granting of a Rule 23.1 motion does not address claims brought in the name of the corporation. It addresses only the first phase of the derivative action in which the stockholder sues individually.

Under these controlling Delaware precedents, until the derivative action passes the Rule 23.1 stage, the stockholder does not have authority to assert the corporation's claims and is not suing in the name of the corporation. Until a Rule 23.1 motion is denied or the board decides not to oppose the derivative action, the stockholder plaintiff is only suing to "compel the corporation to sue." *Aronson,* 473 A.2d at 811. Put differently, the stockholder is asking the Court for authority to sue in the name of the corporation. Indeed, where a court *grants* a Rule 23.1 motion, the fact that the suing stockholder lacks authority to sue in the name of the corpo-

not rely on any of them for the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm,* I have chosen to omit the cumbersome subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Delaware derivative action canon.

9. *See Schoon v. Smith,* 953 A.2d 196, 201–02 (Del.2008) (tracing history of derivative action and explaining its dual nature); *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990) (quoting *Aronson* for the "two-fold" nature of the derivative action); *Sternberg v. O'Neil,* 550

A.2d 1105, 1124 n. 41 (Del.1988) ("The normal derivative suit was 'two suits in one: (1) The plaintiff brought a suit in equity against the corporation seeking an order against it; (2) to bring a suit for damages or other legal injury for damages or other relief against some third person who had caused legal injury to the corporation.'" (quoting Robert C. Clark, *Corporate Law* 639–40 (1986))); *Peat, Marwick,* 540 A.2d at 730 (quoting *Aronson* in describing the "two-fold" nature of the derivative action); *Zapata,* 430 A.2d at 784 (citing "the 'two phases' of a derivative suit, the stockholder's suit to compel the corporation to sue and the corporation's suit").

ration and assert corporate claims should be clear. That is precisely what granting a Rule 23.1 motion means. This fact in turn exposes the inequity of defendants subsequently arguing for preclusive effect. Having first argued in their Rule 23.1 motion that the stockholder plaintiff lacks authority to assert claims derivatively on behalf of the corporation—*and having prevailed on that point*—the same defendants next argue that the stockholder nevertheless had authority to assert the claims.on behalf of the corporation sufficient to bind all other stockholders. Judicial estoppel should bar such a reversal of position.[10]

In my view, therefore, the legal truism that the underlying claim in a derivative action belongs to the corporation and ultimately will be asserted in the corporation's name if the stockholder plaintiff receives permission to sue does not support the proposition that stockholders are in privity for purposes of the preclusive effect of an order granting a Rule 23.1 motion. At

that phase of the case, the competing stockholders are asserting only their individual claim to obtain equitable authority to sue. *See Aronson,* 473 A.2d at 811; *Cantor,* 162 A. at 76.

Courts giving preclusive effect to Rule 23.1 dismissals also have relied on generally accurate statements to the effect that a judgment in an action brought by or on behalf of the corporation binds all stockholders. For example, in *Henik,* a decision often cited as authority for giving preclusive effect to a Rule 23.1 dismissal, the court quoted a 1942 decision for the proposition that " '[a] judgment in the stockholders' derivative action is res judicata both as to the corporation and as to all of its stockholders, including stockholders who were not parties to the original action in subsequent actions based upon the same subject matter.' " 433 F.Supp.2d at 380 (quoting *Ratner v. Paramount Pictures, Inc.,* 6 F.R.D. 618, 619 (S.D.N.Y. 1942)).[11]

**10.** *See, e.g., In re First Interstate Bancorp Consol. S'holder Litig.,* 729 A.2d 851, 859 n. 8 (Del.Ch.1998) ("The doctrine of judicial estoppel precludes a party 'from asserting in a legal proceeding, a position inconsistent with a position previously taken by him in the same or in an earlier proceeding.' " (quoting *Coates Int'l, Ltd. v. DeMott,* 1994 WL 89018, at *5 (Del.Ch. Feb. 4, 1994))); *see also Rissetto v. Plumbers & Steamfitters Local 343,* 94 F.3d 597, 600 (9th Cir.1996) ("Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position."); *InterGen N.V. v. Grina,* 344 F.3d 134, 144 (1st Cir.2003) ("As a general matter, the doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding."); *cf. Transclean Corp. v. Jiffy Lube Int'l, Inc.,* 474 F.3d 1298 (Fed.Cir.2007) (holding that when plaintiff argued that privity existed for purposes of merits, judicial estoppel prevented plaintiff from

reversing position to resist collateral estoppel).

**11.** For similar propositions, *see, e.g., Cramer v. Gen. Tel. & Elecs. Corp.,* 582 F.2d 259, 269 (3d Cir.1978) ("Nonparty shareholders are usually bound by a judgment in a derivative suit on the theory that the named plaintiff represented their interests in the case."); *Dana v. Morgan,* 232 F. 85, 89 (2d Cir.1916) (explaining that a stockholder derivative "action is really the action of all the stockholders, as it is necessarily commenced in their behalf and for their benefit. And as in such suits the wrong to be redressed is the wrong done to the corporation and as the corporation is a necessary part to the suit, it inevitably follows that there can be but one adjudication on the rights of the corporation. And it is undoubted law that the judgment in the state court is an estoppel and a finality not only as to all matters actually litigated in the suit but also as to all matters which were not but might have been presented to the court and passed upon therein."); *Parkoff v. Gen. Tel. & Elecs. Corp.,* 53 N.Y.2d 412, 442 N.Y.S.2d 432, 425 N.E.2d 820, 824 (1981) ("Because the claim

This statement of black letter law certainly holds true when the plaintiff has authority to assert the corporation's claims. It holds, for example, when (i) the corporation has brought the case or taken it over through the special litigation committee process, (ii) the derivative plaintiff has survived a Rule 23.1 motion, thereby gained authority to sue, and obtained a decision on summary judgment or at trial, or (iii) a court has approved a derivative action settlement and made the determinations required by Rule 23.1. The statement does not hold true when the stockholder plaintiff lacks authority to sue on behalf of the corporation, and it particularly does not hold true for a decision determining that the stockholder plaintiff lacks authority to sue.

This Court has held squarely that the adjudication of one stockholder's individual claim does not have preclusive affect on a second stockholder's ability to assert the claim. *Kohls v. Kenetech Corp.*, 791 A.2d 763 (Del.Ch.2000), *aff'd*, 794 A.2d 1160 (Del.2002). In *Kohls*, preferred stockholders filed suit to enforce their claimed entitlement to a preferential distribution on their securities. *Id.* at 766. Certain other non-party preferred stockholders previously had brought an individual action requesting similar relief that resulted in a post-trial judgment for the defendants. *Id.* at 767, 768 n. 18. The defendants argued that under the doctrines of *res judicata* and collateral estoppel, the prior judgment barred the later stockholders from relitigating the claim to a preferential distribution. *Id.* at 767. This Court rejected the defendants' preclusion arguments, *id.* at 770, and the Delaware Su-

preme Court affirmed, *Kohls v. Kenetech Corp.*, 794 A.2d 1160 (Del.2002) (ORDER).

The Court of Chancery in *Kohls* started from the foundational principle that "[a] person who is not a party to an action is not bound by the judgment in that action." 791 A.2d at 769 (quoting Restatement (Second) of Judgments § 62 cmt. c (1982) [hereinafter Judgments]). This "basic principle of law" is subject to three exceptions. Judgments § 62 cmt. a. One applies "where a non-party has a *specific type of pre-existing legal relationship with a named party*, such as bailor and bailee, predecessor and successor or indemnitor and indemnitee." *Kohls*, 791 A.2d at 769. "Being fellow stockholders is plainly not the type of legal relationship that fits [this] exception.... An individual stockholder is not, solely because of potentially aligned interests, presumed to act in the place of (and with the power to bind) the other stockholders." *Id.*

A second exception applies when "a person who is not a party to an action ... is involved with it in a way that falls short of becoming a party but which justly should result in his being denied opportunity to relitigate the matters previously in issue." Judgments § 62 cmt. a. "Several kinds of conduct by a non-party are recognized as having this effect. These include allowing the use of one's name as a party when the effect is to mislead an opposing litigant; assuming control of litigation being maintained by another; and agreeing to be bound by an adjudication between others." *Id.* (citations omitted). Concrete, case-specific actions by a stockholder plaintiff or its counsel might well trigger this exception, such as, for example, if the same counsel represented both stockholders or

asserted in a stockholder's derivative action is a claim belonging to and on behalf of the corporation, a judgment rendered in such an action brought on behalf of the corporation

by one shareholder will generally be effective to preclude other actions predicated on the same wrong brought by other shareholders.").

the plaintiffs otherwise collaborated. This Court's Section 220 jurisprudence has developed similar principles for determining when one stockholder's efforts to use Section 220 should be limited by a different stockholder's filing of a federal securities action that triggered the automatic stay under the Private Securities Litigation Reform Act (the "PLSRA"). *See, e.g., Beiser v. PMC–Sierra, Inc.,* 2009 WL 483321, at *3 (Del.Ch. Feb. 26, 2009); *Cohen v. El Paso Corp.,* 2004 WL 2340046, at *2 (Del. Ch. Oct. 18, 2004). But the general scenario of parallel, overlapping, or *seriatim* efforts by unaffiliated stockholders to assert or prompt the assertion of corporate claims does not implicate this exception.

This leaves the third and most pertinent exception: a properly commenced and maintained representative action. *Kohls,* 791 A.2d at 769. Stockholder class and derivative actions clearly qualify, but even here, the authority to represent others is not conferred automatically by filing of complaint. "A representative party must be granted ... authority, either by the represented party itself (in accordance with agency principles) or, in the class action context, by the court." *Id.* It is "self-evident that if a litigant never seeks to and is never compelled to act in a representative capacity, the class of people that *theoretically could have been* represented by that litigant is in no way precluded from asserting their own claims in a subsequent proceeding." *Id.* at 769–70. *See* Judgments § 41 (identifying categories of persons who can bind non-parties as including "[t]he representative of a class of persons similarly situated, *designated as such with the approval of the court,* of which the person is a member" (emphasis added)); *id.* § 59 cmt. c ("The stockholder's or member's derivative action is usually though not invariably in the form of a suit by some of the stockholders or members as representatives of all of them.

Whether the judgment in such a representative suit is binding upon all stockholders or members is determined by the rules stated in §§ 41 and 42.").

Despite determining that neither *res judicata* nor collateral estoppel applied, the *Kohls* Court nevertheless dismissed the second lawsuit as a matter of *stare decisis:* "[B]ecause the [plaintiffs] fail to distinguish their claims, either factually or legally, from those adjudicated" in the prior action, "[n]ormal respect for the principle of *stare decisis*" required dismissal under Rule 12(b)(6). 791 A.2d at 770. "[A]lthough plaintiffs are not literally bound by the [underlying judgment], they must still state a viable cause of action." *Id.* In other words, the prior judgment was not preclusive, but it still could be persuasive and compel dismissal.

When a stockholder representative pursues claims on a class basis, authority is conferred by the Court's class certification ruling. *See* Ct. Ch. R. 23; *Schwarzschild v. Tse,* 69 F.3d 293, 297 (9th Cir.1995) ("[W]hen defendants obtain summary judgment before the class has been properly certified or before notice has been sent, ... [the summary judgment] decision binds only the named plaintiffs."); 3 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 7.15, at 52 (4th ed. 2002) ("[I]f a motion to dismiss or for summary judgment is granted in favor of the defendants" prior to class certification, "the resulting order would not be binding on the class which would not suffer prejudice."). When a stockholder representative pursues claims in a derivative action, authority can be conferred in two ways. First, the board of directors or a duly empowered committee can approve the litigation expressly or by failing to oppose it. *See Peat, Marwick,* 540 A.2d at 730. Second, and more commonly, a court can determine that the stockholder plaintiff has au-

thority to proceed by denying a Rule 23.1 motion because the complaint adequately pleads either that demand should be excused as futile or that demand was made and wrongfully refused.

When the *same* stockholder responds to a Rule 23.1 dismissal by attempting to file a second complaint alleging demand futility, the "same party" requirement is met and a Rule 23.1 dismissal may have preclusive effect. *See W. Coast Mgmt.*, 914 A.2d at 641–44 (holding that collateral estoppel bars "the same plaintiff" from filing a subsequent derivative suit); *see also Meng v. Schwartz*, 305 F.Supp.2d 49, 60 (D.D.C. 2004) (applying collateral estoppel to bar same derivative plaintiffs' efforts to relitigate previously dismissed claims); *Treeby v. Aymond*, 2000 WL 869502, at *8 (E.D.La. June 28, 2000) (issuing injunction against state court derivative action where same stockholder sought to relitigate demand excusal), *aff'd*, 251 F.3d 156 (5th Cir.2001). The same stockholder therefore cannot attempt to plead demand futility, lose, and then try again. This is also true as a matter of demand futility law. In *Grimes*, the Delaware Supreme Court held that if a stockholder files a complaint alleging that demand should be excused as futile and the complaint is dismissed pursuant to Rule 23.1, that same stockholder cannot try again with a different set of demand futility allegations. 673 A.2d 1207, 1218–19. That the Delaware Supreme Court rendered its decision without mentioning collateral estoppel or *res judicata* suggests that the high court did not envision an expansive (if any) role for preclusion doctrine in the Rule 23.1 context.[12]

Consequently, when a different stockholder attempts to plead demand excusal, an earlier Rule 23.1 dismissal should not have preclusive effect. The earlier dismissal terminated the first phase of the prior derivative action, in which the complaining stockholder asserted an individual claim to seek equitable authority to sue on behalf of the corporation. Under *Kohls*, the prior ruling does not affect the individual claims of other stockholders to seek equitable authority to sue. It similarly has no effect on the second-phase issue of the corporation's cause of action. The decision does, of course, carry persuasive weight and can operate as *stare decisis*.

The Court of Chancery traditionally has recognized these principles. "It is common practice in this court where there are inadequate allegations of demand futility to dismiss derivative suits as to the named plaintiff, but not as to the corporation or its other stockholders." *W. Coast Mgmt.*, 914 A.2d at 642. Effective June 1, 2001, the Court of Chancery adopted Rule

---

12. The *Grimes* Court also made clear that the same stockholder plaintiff can subsequently make a litigation demand, use Section 220 to explore whether the demand was wrongfully refused, and (if appropriate) file a demand-refused case. *See* 673 A.2d at 1218–19; *see also Spiegel*, 571 A.2d at 776–77. By filing the original demand futility complaint, the stockholder does not does not concede the independence or disinterestedness of the board for purposes of alleging wrongful refusal (as opposed to demand futility). *Scattered Corp.*, 701 A.2d at 74–75; *Grimes*, 673 A.2d at 1219. A stockholder who makes demand concedes that the board is disinterested and independent with respect to the demand and therefore cannot argue that demand should have been excused as futile; he only can argue that the demand was wrongfully refused. *Spiegel*, 571 A.2d at 775. Contrary to *Grimes*, at least one court has applied preclusion principles broadly to bar subsequent efforts to plead wrongful refusal. *See Carroll*, 2008 WL 731834, at *10 (applying Delaware law and holding that "plaintiff may not relitigate the issue of the Board's independence and disinterest [in the demand refusal context] because the Federal Court already conclusively resolved this issue [in the demand futility context]"). Under *Grimes*, this holding appears incorrect.

15(aaa), which limits a plaintiff's ability to file *seriatim* amended complaints. It provides:

> [A] party that wishes to respond to a motion to dismiss under Rules 12(b)(6) or 23.1 by amending its pleading must file an amended complaint, or a motion to amend in conformity with this Rule, no later than the time such party's answering brief in response to either of the foregoing motions is due to be filed. In the event a party fails to timely file an amended complaint or motion to amend under this subsection (aaa) and the Court thereafter concludes that the complaint should be dismissed under Rule 12(b)(6) or 23.1, such dismissal shall be with prejudice *(and in the case of complaints brought pursuant to Rules 23 or 23.1 with prejudice to the named plaintiffs only)* unless the Court, for good cause shown, shall find that dismissal with prejudice would not be just under all the circumstances. Rules 41(a), 23(e) and 23.1 shall be construed so as to give effect to this subsection (aaa).

Ct. Ch. R. 15(aaa) (emphasis added). The language of Rule 15(aaa) confirms that a dismissal pursuant to Rule 23.1 is "with prejudice to the named plaintiffs only." *Id.*

This Court took a different approach in *Career Education*, a decision with which I respectfully disagree. *Career Education* followed the federal cases holding that a Rule 23.1 dismissal has broad preclusive effect.[13] It summarized those decisions as follows:

> [A] trend in recent federal case law extend[s] collateral estoppel to different plaintiffs in a second derivative suit.

Those cases justified the extension of [estoppel] doctrine based on the unique position of the parties in derivative suits. Because the corporation is the true party in interest in a derivative suit, courts have precluded different derivative plaintiffs in subsequent suits. This commonality lends itself to the application of collateral estoppel or issue preclusion.

2007 WL 2875203, at *10 (footnotes omitted). The *Career Education* decision thus assumed, as did the federal cases, that privity exists for purposes of a Rule 23.1 dismissal because "the corporation is the true party in interest in a derivative suit." *Id.* As discussed, controlling Delaware Supreme Court authority dictates a contrary conclusion at the Rule 23.1 stage. Notably, the plaintiffs in *Career Education* "concede[d] that collateral estoppel or issue preclusion applie[d] to their Rule 23.1 arguments" and contended only that they should not be precluded from raising issues not addressed in the prior action. *Id.* at *7. The *Career Education* Court therefore accepted that a Rule 23.1 dismissal would have preclusive effect, did not grapple with the authority issue, and analyzed only whether (i) the plaintiffs in the prior proceeding provided adequate representation and (ii) the two cases involved different issues.

In my view, contrary to *Career Education*, an earlier Rule 23.1 dismissal does not have preclusive effect on a subsequent derivative action brought by a different plaintiff because, as the earlier Rule 23.1 decision itself established, the prior plaintiff lacked authority to sue on behalf of the corporation and therefore was not in privity with the corporation or other stockhold-

---

13. *See Career Educ.*, 2007 WL 2875203, at *10 (citing *LeBoyer, Henik,* and *Sonus Networks*); *see also Norfolk Cty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *7–9 (Del. Ch. Feb. 12, 2009) (discussing the federal preclusion approach adopted in *Career Education* and denying Section 220 inspection after Rule 23.1 dismissal of earlier derivative action brought a by different stockholder).

ers. This does not mean that the Rule 23.1 decision has no value or, as several courts have posited, that demand futility could be relitigated *ad infinitum*.[14] As *Kohls* makes clear, the earlier decision remains persuasive authority and could operate as *stare decisis*. When any other derivative plaintiff faces a Rule 23.1 motion involving the same transaction, the plaintiff must distinguish the new complaint or explain how the prior court erred such that the outcome of the motion would be different. I suspect that in many cases, the second court will follow the earlier ruling.

### 3. Inadequate Representation

■ As an independent basis for declining to give collateral estoppel effect to the California Judgment, I find that the California plaintiffs did not adequately represent Allergan. The decisions that give preclusive effect to a Rule 23.1 dismissal universally recognize that another stockholder still can sue if the first plaintiff provided inadequate representation.[15]

Chancellor Strine has suggested Delaware law presume that a fast-filing stockholder with a nominal stake, who sues derivatively after the public announcement of a corporate trauma in an effort to shift the still-developing losses to the corporation's fiduciaries, but without first conducting a meaningful investigation, has not provided adequate representation. See *King v. VeriFone Hldgs., Inc.*, 994 A.2d 354, 364 n. 34 (Del.Ch.2010) (*"King I"*), rev'd on other grounds, 12 A.3d 1140 (Del. 2011) (*"King II"*).

When a derivative plaintiff files a damages action hastily in the wake of a public announcement, there is no basis for expediting the case to further the interests of the corporation and its stockholders, and, when the derivative plaintiff forewent a books and records investigation and a period of deep reflection on the publicly available documents and the law, should not the presumption be that the plaintiff is not fit to serve as the lead fiduciary for the corporation and its stockholders? What rational argument is there that it advances the legitimate interests of investors to give a

14. *See, e.g., Henik*, 433 F.Supp.2d at 380 ("[I]f [preclusion] were not the rule, shareholder plaintiffs could indefinitely relitigate the demand futility question in an unlimited number of state and federal courts, a result the preclusion doctrine specifically is aimed at avoiding."); *see also Bed Bath & Beyond*, 2007 WL 4165389, at *7 (quoting *Henik*); *Hanson*, 2007 WL 5186795, at *7 (quoting *Henik*); *Levin ex rel. Tyco Int'l Ltd. v. Kozlowski*, 13 Misc.3d 1236(A), 2006 WL 3317048, at *14 (N.Y.Sup.Ct. Nov. 14, 2006) (quoting *Henik*), aff'd, 45 A.D.3d 387, 846 N.Y.S.2d 37 (2007).

15. *See, e.g., Sonus Networks*, 499 F.3d at 64 ("[T]o bind the corporation, the shareholder plaintiff must have adequately represented the interests of the corporation."); *Henik*, 433 F.Supp.2d at 381 ("It should be noted that there may be grounds warranting a different preclusion analysis and result where the plaintiff shareholder in the first action is al-

leged to have inadequately represented the interests of all of the shareholders."); *Hanson*, 2007 WL 5186795, at *6 ("[C]ollateral estoppel is improper where the interests of nonparty plaintiffs facing preclusion were not adequately represented in the prior litigation."); *Norfolk Cty.*, 2009 WL 353746, at *8 ("If a subsequent plaintiff makes credible allegations that the interests of the corporation were not suitably represented in the prior proceeding, collateral estoppel may not apply."); *Career Educ.*, 2007 WL 2875203, at *10 ("Where a plaintiff alleges that the interests of the corporation were not suitably represented in the prior proceeding collateral estoppel may not apply."). *See generally* Judgments § 42 ("A person is not bound by a judgment for or against a party who purports to represent him if ... [t]he representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts making that failure apparent.").

leg up to the first to get to court in a situation when being first to court is likely to compromise the ability of the filing plaintiff to sustain his derivative complaint? Admittedly, there are no easy answers to the question of how to select lead counsel in representative actions, but what is certain is that rewarding plaintiffs and their counsel who sue first, and investigate and think second is likely to maximize the costs to investors of representative suits and minimize the benefits. Put simply, the speed racer approach might benefit certain interests, but those interests do not include the investors of corporations or the other societal constituencies dependent on the effective and efficient governance of corporations.

*King I*, 994 A.2d at 364 n. 34; *see Baca v. Insight Enters., Inc.,* 2010 WL 2219715, at *5 (Del.Ch. June 3, 2010) (questioning "whether a stockholder with a nominal stake who files an indemnification-based derivative action" quickly after the announcement of a corporate trauma "is adequately representing the interests of the corporation, as opposed to facilitating the pursuit of economic self-interest by an entrepreneurial law firm"). I adopt and apply the fast-filer presumption in this case.

### a. The Fast–Filing Problem

Appreciating the need for the fast-filer presumption requires a big-picture understanding of the role derivative actions play in the corporate landscape. For publicly traded Delaware corporations, the enforcement of fiduciary obligations is largely carried out by specialized plaintiffs' firms who bring claims on a contingent basis.[16] Because diversified investors are rationally passive, specialized plaintiffs' firms play a critical role in the functioning of our legal system. As Chancellor Allen explained,

[a] fundamental condition of the corporate form when stockholders are widely dispersed, as typically occurs in public corporations, is that individual shareholders have little incentive to bear the costs associated with activities that monitor board of director (or management) performance. Of course, a fundamental advantage that the corporate form offers to owners of capital is the utility that an investor gains through centralized management. Centralized management allows passive (low cost) ownership and promotes investor diversification. Limited liability and the entity status of a corporation similarly allow investors to be relatively passive. While the conditions that allow investors to be rationally passive are a primary source of utility, they can also lead to inefficiency to the extent centralized management may have incentives that are not perfectly aligned with those of the residual owners of the firm, which is inevitably the case. This imperfect alignment of incentives will inevitably lead to excess costs associated with centralized management. For that reason *some* expen-

---

16. *See* Reinier Kraakman et al., *When Are Shareholder Suits in Shareholder Interests?,* 82 Geo. L.J. 1733, 1733 (1994) ("Shareholder suits are the primary mechanism for enforcing the fiduciary duties of corporate managers."); Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform,* 58 U. Chi. L.Rev. 1, 10 (1991) ("The shareholder's derivative suit is one of many devices in corporate law for controlling these conflicts between managers and shareholders."); Donald E. Schwartz, *In Praise of Derivative Suits: A Commentary on the Paper of Professors Fischel and Bradley,* 71 Cornell L.Rev. 322, 323 (1986) ("Liability rules, enforced by shareholder litigation, are theoretically sound and profoundly affect the conduct of corporate managers, at least some aspects of their duties.").

ditures for shareholder monitoring would be efficient. Such monitoring is, of course, more or less costly to the shareholder who engages in it. In a public company with widely distributed shares any particular shareholder has very little incentive to incur those costs himself in pursuit of a collective good, since unless there is some method to force a sharing of costs, he will bear all of the costs and only a (small) pro rata share of any gains that the monitoring yields.

*Bird v. Lida, Inc.*, 681 A.2d 399, 402–03 (Del.Ch.1996) (footnote omitted). Due to rational passivity, "it is likely that in a public corporation there will be less shareholder monitoring expenditures than would be optimum from the point of the shareholders as a collectivity." *Id.* at 403. Incentivized by contingent fees, specialized plaintiffs' firms can "pursue monitoring activities that are wealth increasing for the collectivity (the corporation or the body of its shareholders)." *Id.*

Because specialized plaintiffs' firms ultimately receive compensation from awards of attorneys' fees, their interests can diverge from the class or entity they represent.[17] Interests diverge routinely during the initial period following an event that could provide a basis for filing a case. *See Biondi*, 820 A.2d at 1158–59 (discussing representative counsel's interests when filing a derivative action); *see also Silverstein v. Warner Commc'ns, Inc.*, 1991 WL 12835, at *2–3 (Del.Ch. Feb. 5, 1991) (Allen, C.) (discussing similar interests of representative counsel in class action context).

A plaintiffs' firm only can obtain a fee if it first obtains a result. A firm cannot obtain a result if a competitor gains control of the case. Many jurisdictions are perceived to follow a "first-filed" rule that gives control within that jurisdiction to the first stockholder plaintiff and associated law firm to file a representative action.[18]

---

**17.** *See, e.g., In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 117 (Del.Ch.2009) ("A shareholder plaintiff in a derivative suit alleges claims in the right of the corporation rather than directly; thus, representative actions raise the concern that the best interest of the class might diverge from the best interest of the representative plaintiff's attorneys."); *Biondi v. Scrushy*, 820 A.2d 1148, 1159 (Del. Ch.2003) ("[R]epresentative actions pose certain dangers—in particular, the potential divergence in the best interests of the plaintiffs' attorneys and the plaintiffs they are purporting to represent ...."), *aff'd sub nom. In re HealthSouth Corp. S'holders Litig.*, 847 A.2d 1121 (Del.2004); Stephen A. Saltzburg et al., *Third Circuit Task Force Report on Selection of Class Counsel*, 74 Temp. L.Rev. 689, 706–07 (2001) (discussing divergent interests); Macey & Miller, *supra*, at 17–18 (same); John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L.Rev. 669, 684–91 (1986) (same).

**18.** *See, e.g.*, Elliot J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How*

*Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J.2053, 2062 (1995) ("Courts most often appoint as lead counsel the lawyer who files the first complaint. Thus, plaintiffs' lawyers 'race to the courthouse.'" (footnote omitted)). In *King II*, the Delaware Supreme Court stated that "[b]eing the 'first to file' does not automatically confer lead-plaintiff status." 12 A.3d at 1151. Within Delaware, that statement is true, and the Court cited two Chancery decisions in support. *Id.* Outside of Delaware, the answer is far from clear. The *King II* decision cited a Ninth Circuit case and one decision from each of the Northern District of California, the Northern District of Georgia, and the Northern District of Illinois in which the courts considered more than filing speed. *See id.* at 1151 n. 66. I suspect that this sample is not representative, that many counsel selection decisions are not published, and that first-to-file still plays a significant role. *See* John Armour et al., *Is Delaware Losing Its Cases?* 37 (European Corporate Governance Inst., Law Working Paper No. 151/2010, 2012), *available at* http://ssrn.com/abstract=1578404 (reporting

Many jurisdictions likewise are perceived to give precedence to a "first-filed" action versus later-filed actions in other jurisdictions.[19] When an event occurs that could provide grounds for a representative action, the first-filed rule incentivizes plaintiffs' lawyers to file as fast as possible in an effort to gain control of the litigation. Motivated by first-to-file pressure, plaintiffs' firms rationally eschew conducting investigations and making books and records demands, fearing that any delay would enable competitors to gain control of the litigation and freeze-out the diligent lawyer. No role, no result, no fee.

The conflict arises because fast-filing imposes real costs on corporations and their stockholders. When fast-filed complaints follow the announcement of a transaction or other event that likely will require expedited litigation, they at least perform the beneficial function of identifying the firms who wish to compete for leadership status. In a quickly evolving deal setting, fast-filing enables a leadership structure to be put in place so that expedited litigation can begin in earnest. But in contexts that do not warrant expedition, any administrative benefit disappears. When plaintiffs sue derivatively to recover damages from di-rectors and senior officers for harm suffered by the corporation, the hastily filed complaints have little chance of surviving a Rule 23.1 motion, yet the defendant fiduciaries must respond, and the corporation must underwrite the costs of defense, either directly through indemnification and advancement or indirectly through insurance.

### b. The Idealized Derivative Action

When a corporation suffers harm, the board of directors is the institutional actor legally empowered under Delaware law to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved. *See* 8 Del. C. § 141(a). "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson*, 473 A.2d at 811. "Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)." *Zapata*, 430 A.2d at 782 (footnote omitted). Section

---

that "interviewees told us that the first-to-file 'custom' nevertheless remains important" outside of Delaware and that "[w]hen plaintiffs' lawyers cannot resolve for themselves who should be lead counsel, judges outside Delaware often appoint as lead or co-lead counsel the firm that filed first"); *see also Walker v. Discover Fin. Servs.*, 2011 WL 2160889, at *3 (N.D.Ill. May 26, 2011) (utilizing filing speed as proxy for amount of work by counsel in "identifying and investigating potential claims"); *Wright v. Krispy Kreme Doughnuts, Inc.*, 232 F.R.D. 528, 530–31 (M.D.N.C.2005) (appointing first-filer as lead plaintiff over plaintiff that opted to first pursue books and records action). Regardless, whether jurisdictions actually give significant weight to first-to-file has less significance for influencing filing behavior than lawyer perception.

19. *See* Edward P. Welch, et al., *Mergers & Acquisitions Deal Litigation Under Delaware Corporation Law* § 2.01[B][3][a], at 2–16 to –17 (noting that "either defendants or plaintiffs may cite to the 'first-to-file' rule" to support a motion to dismiss or stay later-filed actions in other jurisdictions (footnotes omitted)); Armour et al., *supra*, at 6 (noting that while defendants can seek a stay or dismissal by filing a *forum non conveniens* motion, "success … is not assured, with the likelihood of success decreasing if the case was filed first in that state court"); Geoffrey P. Miller, *Overlapping Class Actions*, 71 N.Y.U. L.Rev. 514, 522 (1996) (reporting that "courts are more likely to defer to sister-state proceedings if the parallel case was filed first").

141(a) vests statutory authority in the board of directors to determine what action the corporation will take with its litigation assets, just as with other corporate assets. *See id.*

Absent sufficient reason to doubt the directors' ability to make disinterested and independent decisions about litigation, the board is not only empowered but optimally positioned to make decisions on behalf of the corporation and, if appropriate, pursue litigation. The board can ·deploy the corporation's resources to investigate the wrongdoing and seek a remedy. The directors have full access to the corporation's internal information, including privileged communications. The board can seek cooperation from management and employees and utilize the company's internal expertise. In contrast to the Court, which typically only can award some form of damages, the board can bargain with alleged wrongdoers and craft remedies that may better serve the entity. Perhaps most significantly, the board can take into consideration and balance the interests of multiple constituencies when determining what outcome best serves the interests of stockholders. *See, e.g.,* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 13.15, at 13–75 (3d ed.1998) (listing factors that special litigation committee should consider, including "[t]he magnitude and merits of the claims; [t]he size and likelihood of a recovery of damages or other relief; [t]he possible detriment to the company from the assertion of any claims, as well as the indirect costs, such as the effect upon other potential

litigation to which the company is a party, and relationships with customers or suppliers; and [t]he remedial steps already taken and that, in the future, could be taken by the corporation to prevent a reoccurrence of the challenged actions"). Consequently, both as a matter of legal authority and optimal resource allocation, the "board of directors, unless legally disabled, should be presented with the opportunity to manage litigation that seeks to redress harm inflicted upon the corporation." *Saito v. McCall,* 2004 WL 3029876, *10 (Del.Ch. Dec. 20, 2004), *overruled on other grounds, Lambrecht v. O'Neal,* 3 A.3d 277 (Del. 2010).

■ In a derivative suit, a stockholder seeks to displace the board's authority. *Aronson,* 473 A.2d at 811; *see also Desimone v. Barrows,* 924 A.2d 908, 914 (Del. Ch.2007) (noting that issue for Rule 23.1 motion is "whether the ... board should be divested of its authority to address [the underlying] misconduct"). To do so, the complaint must allege with particularity that the board was presented with a demand and refused it wrongfully or that the board could not properly consider a demand, thereby excusing the effort to make demand as futile. Framed in the language of controlling Delaware Supreme Court precedent, demand is futile when "the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint. is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." [20]

**20.** *Rales,* 634 A.2d at 934. In *Aronson,* the Delaware Supreme Court first crafted a specific two-part version of the subsequently articulated *Rales* test that applies when a derivative plaintiff challenges a board decision made by the same directors who remain in office at the time suit is filed. *Compare Aron-*

*son,* 473 A.2d at 814 (articulating two-part test where board composition did not change) *with Rales,* 634 A.2d at 933–34 (explaining that "[c]onsistent with the context and rationale of the *Aronson* decision, a court should not apply the *Aronson* test for demand futility where the board that would be considering

A breach of fiduciary duty claim that seeks to hold directors accountable for the consequences of a corporate trauma is known colloquially as a *Caremark* claim, in a tip of the judicial hat to Chancellor Allen's landmark decision. *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del.Ch.1996). Because it is safe to say that non-sociopathic directors never consciously choose for the entity they oversee to suffer a disaster, a *Caremark* claim contends that the directors set in motion or "allowed a situation to develop and continue which exposed the corporation to enormous legal liability and that in doing so they violated a duty to be active monitors of corporate performance." *Id.* at 967. The list of corporate traumas for which stockholders theoretically could seek to hold directors accountable is long and ever expanding: regulatory sanctions, criminal or civil fines, environmental disasters, accounting restatements, misconduct by officers or employees, massive business losses, and innumerable other potential calamities.

■ A stockholder cannot displace the board's authority simply by describing the calamity and alleging that it occurred on the directors' watch. " '[M]ost of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention.' " *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 364, 372 (Del.2006) (quoting *Caremark*, 698 A.2d at 968). "[O]rdinary business decisions that are made by officers and employees deeper in the interior of the organization can ... vitally affect the welfare of the corporation and its ability to achieve its various strategic and financial goals." *Caremark*, 698 A.2d at 968. "[D]irectors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both. . . ." *Stone*, 911 A.2d at 373. Without a connection to the board, a corporate calamity will not lead to director liability. Without a substantial threat of director liability, a court has no reason to doubt the board's ability to evaluate a demand.

■ To plead a sufficient connection between the corporate trauma and the board, the plaintiff's first and most direct option is to allege with particularity actual board involvement in a decision that violated positive law. In *Caremark*, Chancellor Allen framed the test as whether the directors "knew or ... should have known" about illegality. *Caremark*, 698 A.2d at 971. In *Stone*, the Delaware Supreme

---

the demand did not make a business decision which is being challenged in the derivative suit."). The *Rales* test addresses the same concerns that animate the *Aronson* test and frames the more comprehensive standard. *See David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del.Ch. Feb. 13, 2006) ("the *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination"); *Guttman*, 823 A.2d at 501 ("At first blush, the *Rales* test looks somewhat different from *Aronson*, in that [it] involves a singular inquiry. . . . Upon closer examination, however, that singular inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*."); Donald J. Wolfe, Jr. & Michael A.

Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.02[b][3][iii], at 9–97 (2011) ("[I]t is arguable that the current state of the law is conceptually inverted and that it would be both simpler and more direct to regard the original *Aronson* analysis as a subpart of the more generally applicable and flexible principle set forth in *Rales*."). To recognize the tests as complementary versions rather than exclusive alternatives becomes particularly important for a mixed board where only a subset of the directors made the original decision. As to those directors, *Aronson* helpfully focuses the demand-futility analysis; as to the new directors, *Rales* frames the overarching test.

Court tightened the test to require actual knowledge: "[I]mposition of liability requires a showing that the directors knew they were not discharging their fiduciary obligations." 911 A.2d at 370. Nevertheless, because sophisticated and well-advised individuals do not customarily confess knowing violations of law, a plaintiff following this route effectively must plead facts and circumstances sufficient for a court to infer that the directors knowingly violated positive law. *See In re Am. Int'l Gp., Inc., Consol. Deriv. Litig.*, 965 A.2d 763, 777, 795 (Del.Ch.2009).

■ If the plaintiff cannot point to a decision, then the next alternative is to plead that the board consciously failed to act after learning about evidence of illegality—the proverbial "red flag." A plaintiff might plead, for example, that the directors

> ignored "red flags" indicating misconduct in defiance of their duties. A claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning.

*Shaev*, 2006 WL 391931, at *5 (footnote omitted). A board that fails to act in the face of such information makes a conscious decision, and the decision not to act is just as much of a decision as a decision to act. *See Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del.Ch.2011); *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del.Ch. Jan. 14, 1991). The decision to act and the conscious decision not to act are thus equally subject to review under traditional fiduciary duty principles and equally able to create the requisite connection to the board. *See Spiegel*, 571 A.2d at 773–74 ("[A] conscious decision by a board of directors to refrain from acting may be a valid exercise of business judgment...."); *Aronson*, 473 A.2d at 813 (equating "a conscious decision to refrain from acting" with a decision to act).

■ If there is no evidence of direct board action or conscious inaction, then the plaintiff might seek to plead "that a board of directors is dominated or controlled by key members of management, who the rest of the board unknowingly allowed to engage in self-dealing transactions." *Shaev*, 2006 WL 391931, at *5 n. 11. Typically, however, the plaintiff must fall back to the final means of connecting the directors to illegality: the board's obligation to adopt internal information and reporting systems that are "reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance."[21] If a corporation suffers losses proximately caused by illegal conduct, and if the directors failed "to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists," then there is a sufficient connection between the occurrence of the illegal conduct and board level action or conscious inaction to support liability. *Caremark*, 698 A.2d at 970.

---

21. *Caremark*, 698 A.2d at 970; *see, e.g., Stone*, 911 A.2d at 364 (evaluating claim under failure-to-monitor branch of *Caremark* when "the plaintiffs acknowledge that the directors neither knew nor should have known that violations of law were occurring, *i.e.*, that there were no red flags before the directors" (alteration and internal quotation omitted)); *Shaev*, 2006 WL 391931, at *1 (evaluating claim under failure-to-monitor branch of *Caremark* after noting that the plaintiffs had no indications that the director defendants had any contemporaneous knowledge of the alleged misconduct by Citigroup employees).

■ The burden on a plaintiff when seeking to establish liability under this final route "is quite high." *Id.* at 971.

Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, as in *Graham* [*v. Allis–Chalmers Manufacturing Company,* 188 A.2d 125 (Del.1963) ] or in [the *Caremark* case itself], . . . only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability.

*Id.* "Concretely, this latter allegation might take the form of facts that show the company entirely lacked an audit committee or other important supervisory structures, or that a formally constituted audit committee failed to meet." *Shaev,* 2006 WL 391931, at *5 (footnote omitted); *see Guttman,* 823 A.2d at 507 ("[T]he kind of fact pleading that is critical to a *Caremark* claim [is] . . . contentions that the company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation."). As with the business judgment rule, this demanding standard benefits stockholders as a whole, because "it makes board service by qualified persons more likely, while continuing to act as stimulus to *good faith performance of duty* by such directors." *Caremark,* 698 A.2d at 971.

The standard for *Caremark* liability thus parallels the standard for imposing damages when a corporation has an exculpatory provision adopted pursuant to 8 *Del. C.*

§ 102(b)(7). *See Desimone,* 924 A.2d at 935. "Such a provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty." *Stone,* 911 A.2d at 367.

A failure to act in good faith may be shown, for instance, [1] where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, [2] where the fiduciary acts with the intent to violate applicable positive law, or [3] where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.

*In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 67 (Del.2006) (quoting *In re Walt Disney Co. Deriv. Litig.,* 907 A.2d 693, 755–56 (Del.Ch.2005), *aff'd,* 906 A.2d 27 (Del.2006)). A *Caremark* claim based on the failure to establish a monitoring system seeks to invoke the third of these examples. *See Stone,* 911 A.2d at 369 ("The third of [the *Disney* ] examples describes, and is fully consistent with, the lack of good faith conduct that the *Caremark* court held was a 'necessary condition' for director oversight liability . . . ." (quoting *Caremark,* 698 A.2d at 971)). *See generally* Stephen M. Bainbridge et al., *The Convergence of Good Faith and Oversight,* 55 UCLA L.Rev. 559 (2008) (discussing the re-interpretation of *Caremark* as a good faith case and the potential liability risks to directors that result).

■ Because a plaintiff must plead a connection to the board, only the extremely rare complaint will be able to establish the necessary linkage without referring to internal corporate documents. To obtain the necessary documents, the Delaware

courts have long exhorted potential derivative plaintiffs to use Section 220 to investigate their claims and obtain corporate books and records *before* filing derivative litigation.[22] The Delaware courts have dismissed a steady stream of *Caremark* claims where the plaintiffs have not first used Section 220 to obtain books and records.[23] In bringing these actions, "plain-

**22.** *See, e.g., Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1056–57 (Del.2004) ("Both this Court and the Court of Chancery have continually advised plaintiffs who seek to plead facts establishing demand futility that the plaintiffs might successfully have used a Section 220 books and records inspection to uncover such facts."); *White v. Panic,* 783 A.2d 543, 556–57 (Del.2001) ("[T]his case demonstrates the salutary effects of a rule encouraging plaintiffs to conduct a thorough investigation, using the 'tools at hand' including the use of actions under 8 *Del. C.* § 220 for books and records, before filing a complaint.... [F]urther presuit investigation in this case may have yielded the particularized facts required to show that demand is excused or it may have revealed that the board acted in the best interests of the corporation." (footnote omitted)); *Brehm,* 746 A.2d at 266–67 (disregarding plaintiffs' complaint "that the system of requiring a stockholder to plead particularized facts in a derivative suit is basically unfair because the Court will not permit discovery under Chancery Rules 26–37 to marshal the facts necessary to establish that pre-suit demand is excused," reasoning that "[p]laintiffs may well have the 'tools at hand' to develop the necessary facts for pleading purposes ... [by] seek[ing] relevant books and records of the corporation under Section 220"); *Scattered Corp.,* 701 A.2d at 78–79 ("[P]laintiffs inexplicably did not bring [a Section 220 action before filing their derivative complaint]. Accordingly, plaintiffs cannot argue that they have used the available 'tools at hand to obtain the necessary information before filing a derivative action.' " (quoting *Grimes,* 673 A.2d at 1216)); *Security First Corp. v. U.S. Die Casting & Dev. Co.,* 687 A.2d 563, 567 n. 3 (Del.1997) ("This Court has encouraged the use of Section 220 as an information-gathering tool in the derivative context, provided a proper purpose is shown." (internal quotation omitted)); *Rales,* 634 A.2d at 934 n. 10 (expressing surprise at the rarity with which Section 220 had been used to gather information to satisfy Court of Chancery Rule 23.1, and encouraging Court of Chancery to reward lawyers who use Section 220 before filing by appointing them lead counsel instead of the first-filers).

**23.** *See, e.g., Wood v. Baum,* 953 A.2d 136, 144 (Del.2008) (affirming dismissal of *Caremark* claim under Rule 23.1; noting that "plaintiff could have, but chose not to, make a 'books and records' request"); *In re Dow Chem. Co. Deriv. Litig.,* 2010 WL 66769, at *13 (Del.Ch. Jan. 11, 2010) (dismissing *Caremark* claim under Rule 23.1 where plaintiff did not use Section 220); *Desimone,* 924 A.2d at 951 (noting that plaintiff filed complaint with using Section 220 and therefore had "no idea what the [board's] investigation actually entailed and is unable to plead any facts about what the ... board did, when they did it, what they discussed, what conclusions they reached, and why the board did or did not do anything"); *Rattner v. Bidzos,* 2003 WL 22284323, at *14 (Del.Ch. Sept. 30, 2003) ("[A] symptomatic and ultimately fatal defect to all of Rattner's claims is a failure to plead facts with particularity.... [T]he books and records provisions of 8 *Del. C.* § 220 ... might have been helpful here...."); *In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *3 (Del.Ch. June 5, 2003) ("Despite its prolixity, the Amended Complaint completely fails to set forth adequate reasons why demand is excused. Perhaps the absence of particularized facts excusing demand is the product of a race to the courthouse. It is certainly a result of the plaintiffs' failure to use the 'tools at hand' ...."), *aff'd sub nom. Rabinovitz v. Shapiro,* 839 A.2d 666 (Del. 2003); *Guttman,* 823 A.2d at 493 ("Having failed to heed the numerous admonitions by our judiciary for derivative plaintiffs to obtain books and records before filing a complaint, the plaintiffs have unsurprisingly submitted an amended complaint that lacks particularized facts compromising the impartiality of the ... board that would have acted on a demand."); *id.* at 504 (noting that a § 220 action "could have provided the basis for the pleading of particularized facts"); *White v. Panic,* 793 A.2d 356, 371–72 (Del.Ch.2000) ("*White I* ") (dismissing *Caremark* claim after noting that the plaintiff failed to use Section 220), *aff'd,* 783 A.2d 543 (Del.2001) ("*White II* ").

tiffs seem to hope the Court will accept the conclusion that since the Company suffered large losses, and since a properly functioning risk management system would have avoided such losses, the directors must have breached their fiduciary duties in allowing such losses." *Citigroup*, 964 A.2d at 129. The Delaware courts consistently have rejected "such general ipse dixit syllogisms." *Id.* Not surprisingly, without first obtaining books and records, stockholders have not been able to link the trauma to the directors, and their *Caremark* complaints have been dismissed.[24] By contrast, stockholders who have used Section 220 and obtained documents showing board consideration or involvement have been able to survive Rule 23.1 motions.[25] Put simply, fast-filing generates dismissals.

If dispersed stockholders could act collectively following a corporate trauma,

they would want the corporation to pursue claims vigorously against its fiduciaries only if there was a risk-adjusted prospect of a net-positive recovery. They would not file suit hastily, thereby imposing needlessly on themselves both the cost of their offensive litigation and the burdens of defense. The hypothetical stockholder collective would recognize there was no need to rush. The statute of limitations on a breach of fiduciary duty claim is three years. *In re Tyson Foods, Inc.*, 919 A.2d 563, 584 (Del.Ch.2007). If the underlying corporate trauma resulted from a government investigation, securities class action, or some other slowly unfurling event, there would likely be further developments that would yield additional information that could materially affect whether to sue.[26] This Court routinely stays indemnification-based derivative claims to allow the underlying action giving rise to poten-

**24.** *See, e.g., Wood,* 953 A.2d at 143 (rejecting assertion that a director "should have been on notice" about improper accounting or internal control issues due to his senior position at the company and membership on audit committee); *Hauspie v. Stonington P'rs, Inc.,* 945 A.2d 584, 587–88 (Del.2008) (rejecting argument that director must have known of financial misstatement because he served as a Managing Director and Vice Chairman); *Desimone,* 924 A.2d at 940 ("Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so.").

**25.** *Compare Ash v. McCall,* 2000 WL 1370341, at *16 (Del.Ch. Sept. 15, 2000) (dismissing *Caremark* claims without prejudice where plaintiff failed to use Section 220; noting that "if plaintiffs can allege with some particularity facts indicating that HBOC directors had actual knowledge of accounting irregularities, or knowledge of facts indicating potential accounting irregularities, and took no action until confronted with the DeLoitte audit report in early 1999 (after the merger), such facts, to my mind, could possibly excuse de-

mand as to the Second Oversight Claim") *with Saito v. McCall,* 2004 WL 3029876, *7 (holding after stockholder used Section 220 that complaint challenging same transaction stated *Caremark* claim); *compare Brehm,* 746 A.2d at 266–67 (affirming Rule 23.1 dismissal of complaint for failure to plead particularized facts where plaintiff failed to use Section 220) *with In re The Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 287–90 (Del.Ch.2003) (holding after stockholder used Section 220 that complaint challenging same transaction survived Rule 23.1 motion).

**26.** *See Baca,* 2010 WL 2219715, at *5 (explaining why a rational stockholder plaintiff, "free of the compulsion to win a first-to-file sweepstakes," would not file a derivative action seeking to recover for corporate losses stemming from a restatement and related federal securities action "until after a ruling on a motion to dismiss the Federal Securities Action"); *King I,* 994 A.2d at 357 (noting "the lack of an investor-beneficial reason for urgent filing" in derivative suit where alleged damages were corporation's liability in underlying securities suit that had not yet been resolved).

tial liability to unfold.[27] Trustees who have been empowered to assert corporate claims regularly take their time, conduct thorough investigations, and may sue late in the statute of limitations period after they are well prepared.[28]

Rather than filing hastily, the hypothetical stockholder collective would proceed deliberately. It would hire well-qualified counsel. Through counsel, it would conduct an investigation and seek books and records using Section 220. After obtaining books and records, counsel would evaluate whether it made sense to sue. The books and records might show that the board had an appropriate monitoring system in place, but that the system did not alert the board. Or the books and records might show that despite their good faith efforts, the directors were misinformed or misled. Under these or other circumstances, the hypothetical stockholder collective logically might decide not to sue, preferring to leave their elected fiduciaries to the task of remedying the harm suffered by the corporation and dispensing with expensive litigation that likely would founder on Rule 23.1. If the stockholders had concerns, they might make a litigation demand, provide the board with the results of their

---

**27.** *See, e.g., Brenner v. Albrecht,* 2012 WL 252286, at *7 (Del.Ch. Jan. 27, 2012) (staying derivative indemnification proceeding pending outcome of securities class action); *Brudno v. Wise,* 2003 WL 1874750, at *5 (Del.Ch. Apr. 1, 2003) (granting stay "[g]iven that the overwhelming thrust of the Delaware Action complaint is a demand for indemnification largely for harm to be incurred by [the corporation] in the Federal Securities Action, the sensible ordering of events is for the Federal Securities Action to proceed first"); *see also In re Massey Energy Co.,* 2011 WL 2176479, *27 (Del.Ch. May 31, 2011) ("[T]he plaintiffs, as fiduciaries for other Massey stockholders, [should] be reluctant to prosecute the Derivative Claims they claim are so valuable until the direct claims against Massey are resolved.... Thus, the Derivative Claims should follow, rather than precede, the resolution of the key direct suits and regulatory proceedings."); *Pfeiffer v. Toll,* 989 A.2d 683, 708 (Del.Ch.2010) (directing parties to confer where "[i]t would be counter-intuitive if an action such as this one, which exists to recover for harm imposed on the corporation, was permitted to proceed in a way that increased the burden on the corporation. At a minimum, sensible coordination with the Federal Securities Action is warranted. A stay ... also could make sense."), *abrogated on other grounds, Kahn v. Kohlberg Kravis Roberts & Co., L.P.,* 23 A.3d 831, 840 (Del.2011).

**28.** *See, e.g.,* Amir Efrati, *Madoff Trustee Sues Investors To Recover Funds,* Wall Street Journal, Apr. 10, 2009, http://online.wsj.com/article/SB123930717747706017.html?mg=com-wsj (reporting that Madoff trustee initiated "[w]hat will likely be a bitter, years-long battle" by filing first of numerous clawback suits on April 9, 2009, nearly four months after Madoff was arrested and his company forced into liquidation proceedings); Jacqueline Palank, *Trustee Sues Madoff Investors to Recover $187.5 Million,* Wall Street Journal, Jan. 13, 2012, http://online.wsj.com/article/SB10001424052970204542424045771589810 83769316.html (reporting that Madoff trustee filed four lawsuits on January 12, 2012 that "are the latest of hundreds trying to recover money that Madoff fraudulently paid out to investors as part of the Ponzi scheme"); *see also* Azam Ahmed & Ben Protess, *Trustee Report Details Possible Claims Against Corzine and Others,* June 4, 2012, http://dealbook.nytimes.com/2012/06/04/report-details-last-days-of-mf-global/ (reporting that court-appointed trustee issued 275–page report "based on interviews with more than 100 people and the review of hundreds of thousands of documents" concerning October 2011 collapse of brokerage firm MF Global); Jacqueline Palank, *Trustee Brings FBI, Accounting Experience to Solyndra Probe,* Mar. 27, 2012, http://blogs.wsj.com/bankruptcy/2012/03/27/brings-fbi-accounting-experience-to-solyndra-probe/ (reporting that trustee "filed the results of his four-month-long investigation with the U.S. Bankruptcy Court in Wilmington, Del., which concludes that the now-liquidating Solyndra didn't mislead the Department of Energy about its financial health in connection with its $535 million federal loan guarantee").

investigation, and put the directors on notice. If the board declined to take action, the stockholders again could use Section 220 to investigate and consider a suit if the refusal was wrongful.

By contrast, if the books and records showed director misconduct, then the stockholders could decide to pursue a claim. Their counsel at that point would be well positioned to plead demand futility and survive a motion to dismiss. Importantly for all concerned, the costly process of briefing and arguing motions to dismiss would take place once, based on the stockholders' post-inspection complaint.

Under a first-to-file system, plaintiffs' lawyers cannot act as stockholders collectively would want because by proceeding deliberately, a law firm risks losing control of the case to competitors who file immediately. For fast-filing lawyers, the resulting action has the dynamics of a lottery ticket. In most cases, the fast-filing plaintiff will not have pled a derivative claim that can overcome Rule 23.1. But in the rare case, fate may bless the fast-filer with something implicating the board, or a court might be offended by the magnitude of the corporate trauma and allow the derivative action to proceed. If the action survives a motion to dismiss, then its settlement value increases exponentially. *See* Kenneth B. Davis, Jr., *The Forgotten Derivative Suit*, 61 Vand. L.Rev. 387, 429–30 (2008) ("At least four of the eight [*Caremark* ] cases where plaintiffs survived a motion to dismiss ultimately settled, all with significant attorneys' fees or mone-

tary awards.... [T]he substantial corporate losses incurred in these cases increase the settlement value of a successful demand-excused claim.").

A fast-filer can readily build a portfolio of cases in the hope that one will hit. Filing a derivative claim is relatively cheap. Search costs are minimal because corporations publicly announce material adverse events. Public disclosures, news stories, and analyst reports provide the background information for the claim. *See id.* at 417 (finding empirical evidence "consistent with the critique that derivative suits simply piggyback on what the government (or perhaps even the media) already has uncovered and investigated"); John C. Coffee, Jr., *Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter Is Not Working*, 42 Md. L.Rev. 215, 221 n.15 (1983) (observing phenomenon of "piggybacking" by private plaintiffs' attorneys on efforts by government investigators to unearth wide range of classes of misconduct). Indeed, derivative plaintiffs often piggyback on the efforts of other specialized plaintiffs' firms by filing indemnification-based claims that crib from other complaints. *See, e.g., Guttman*, 823 A.2d at 504 (noting admission by plaintiffs' counsel that the complaints in federal securities class actions provided "the primary source of information" for the derivative complaint). As with a federal securities law claim, the lawyer's most difficult task typically will be finding a suitable plaintiff.[29]

---

**29.** *Cf.* Weiss & Beckerman, *supra*, at 2060 ("[T]he usual pattern is for a lawyer who specializes in representing plaintiffs to take the initiative. The lawyer typically becomes aware of a significant move in the price of a company's stock following disclosure of worse-than-expected earnings or other significant, unexpected information. She then conducts a brief investigation, generates a class action complaint, finds someone to serve as a 'representative' plaintiff, and files the complaint, often within a few days of the disclosure at issue."); Coffee, Jr., *Understanding the Plaintiff's Attorney, supra*, at 679 ("[B]ecause the attorney as private enforcer looks to the court, not the client, to award him a fee if successful, the attorney can find the legal violation first and the client second.").

The first-to-file regime disserves stockholder interests across multiple dimensions. It prevents plaintiffs' lawyers from acting optimally. It forces defendants to respond to multiple complaints in multiple jurisdictions. It also confers significant litigation advantages on defendants. All else equal, defendants would vastly prefer to litigate against a plaintiff that has not used Section 220 or otherwise conducted a meaningful investigation. Witness the string of pleadings-stage dismissals in derivative actions filed after large corporate traumas. A state that ritualistically favored defendants might embrace such a regime, but Delaware has a long history of striving to balance the interests of stockholders and managers to craft an efficient corporation law.[30] "Representative litigation plays an important role in protecting the interests of stockholders, but it will not optimally serve investors unless suits are actually filed on the basis of a real concern that wrongdoing has occurred and after a proper investigation." *King I*, 994 A.2d at 356.

### c. This Court's Efforts To Address Fast Filing

The fast-filer presumption suggested by Chancellor Strine comports with other steps this Court has taken to shape the legal incentives of specialized plaintiffs' firms. In addition to criticizing fast-filed, non-substantive complaints, this Court has made clear that when stockholder plaintiffs sue in a representative capacity, first-to-file does *not* control which plaintiff has the substantive right to proceed.[31] For claims implicating the internal affairs of Delaware corporations, this mitigates the first-to-file problem.

---

**30.** Lawrence A. Hamermesh, *The Policy Foundations of Delaware Corporate Law*, 106 Colum. L.Rev. 1749, 1763–64 (2006) ("[T]oday's drafters of the DGCL do not devote an iota of conscious effort to make that statute more friendly to management and less protective of stockholders.... [W]e favor a much more conservative approach that seeks to maintain whatever balance currently exists, and we are distinctly uncomfortable with any change that alters that balance in either direction."); Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L. 673, 680 (2005) ("[C]orporation law in Delaware is influenced by only the two constituencies whose views are most important in determining where entities incorporate: managers and stockholders.... [I]t is ... fair to say that both groups have a lot of clout, and that Delaware corporate lawmakers seriously consider each group's perspective on all key issues.... [T]he key takeaway point is that Delaware's financial self-interest in legal excellence leads to a productive dynamic for the creation and maintenance of an efficient and fair corporation law.").

**31.** *TCW Tech. Ltd. P'ship v. Intermedia Commc'ns, Inc.*, 2000 WL 1654504, at *3 (Del.Ch. Oct. 17, 2000) ("[N]one of the pending lawsuits in this litigation is entitled to any special status as the lead or coordinating lawsuit simply by virtue of having been filed earlier than any other pending action."); *id.* ("Although it might be thought, based on myths, fables, or mere urban legends, that the first to file a lawsuit in this Court wins some advantage in the race to represent the shareholder class, that assumption, in my opinion, has neither empirical nor logical support.... It is not the race to the courthouse door ... that impresses the members of this Court when it comes to deciding who should control and coordinate litigation on behalf of the shareholder class."); *see, e.g., In re Del Monte Foods Co. S'holders Litig.*, 2010 WL 5550677, at *6 (Del.Ch. Dec. 31, 2010) (choosing lead counsel based on a "nuanced and case-specific test in which the Court examines both the proposed lead counsel and the proposed named plaintiff," but not which complaint was filed first, because "[t]he Court's overriding goal is [to] establish a leadership structure that will provide effective representation"); *Wiehl v. Eon Labs*, 2005 WL 696764, at *1–3 (Del.Ch. Mar. 22, 2005) (appointing lead plaintiff and lead counsel by reference to various factors other than filing speed); *Hirt v. U.S. Timberlands Serv. Co.*, 2002 WL 1558342, at *2 (Del.Ch. July 3, 2002) (same); *TCW Tech.*, 2000 WL 1654504, at *4 (same).

This Court likewise has recognized the need to avoid a ritualistic first-to-file rule when representative plaintiffs compete across multiple jurisdictions. In *Biondi,* Chancellor Strine, then Vice Chancellor, considered whether to defer to a prior-filed Alabama case "initiated by a hastily-filed and cursorily pled complaint that barely alleged one of the claims raised by the Delaware plaintiffs as to only one of the transactions raised by them." 820 A.2d at 1150. In declining to stay the Delaware actions in favor of prior-filed Alabama proceedings, Chancellor Strine recognized that

> representative actions pose certain dangers—in particular, the potential divergence in the best interests of the plaintiffs' attorneys and the plaintiffs they are purporting to represent—that are not addressed, and indeed may be exacerbated, by a legal rule that places determinative weight on which complaint was filed first.
>
> . . . The mere fact that a lawyer filed first for a representative client is scant evidence of his adequacy and may, in fact, support the contrary inference.

820 A.2d at 1159 (footnote omitted). In lieu of first-to-file, this Court balances the factors pertinent to a *forum non conveniens* analysis to determine where it makes sense for the representative action to proceed. *See, e.g., Rosen v. Wind River Sys., Inc.,* 2009 WL 1856460, at *6 (Del.Ch. June 26, 2009); *In re Topps Co. S'holders Litig.,* 924 A.2d 951, 956–64 (Del.Ch.2007); *Ryan v. Gifford,* 918 A.2d 341, 350–51 (Del.Ch.2007).

This Court also adopted Rule 15(aaa), quoted above, to limit a plaintiff's ability to re-plead. Ct. Ch. R. 15(aaa). Under this rule, a plaintiff who files a derivative action cannot freely amend after engaging in briefing on the motion to dismiss. *See Braddock,* 906 A.2d at 783 (explaining purpose and operation of Rule 15(aaa)). By imposing consequences for litigating to a pleadings-stage decision, Rule 15(aaa) encourages plaintiffs to do their homework and prepare a well-crafted complaint.

The Delaware Supreme Court has rejected two other attempts by this Court to address the first-to-file problem, but in each case expressed support for the effort. In *King I,* Chancellor Strine held that by filing a derivative action, a stockholder plaintiff represented consistent with Rule 11 that the plaintiff and his counsel had sufficient information to plead demand futility and did not require additional information. *See* 994 A.2d at 356; *see also* Ct. Ch. R. 11. The Chancellor ruled that the stockholder plaintiff therefore could not plead a proper purpose in a later-filed Section 220 action to obtain books and records relating to the issue of demand futility. *Id.* at 361. In reaching this holding, the Chancellor discussed the incentives created by the first-to-file rule and sought to thwart efforts by fast-filing plaintiffs' lawyers to eat their cake (by filing quickly) while still having it (by obtaining books and records through Section 220). *Id.* at 357–59. The Delaware Supreme Court rejected this interpretation of the proper purpose requirement in cases where the derivative action had been dismissed without prejudice.[32] At the same

---

32. *See King II,* 12 A.3d at 1150 ("[I]t is a proper purpose under Section 220 to inspect books and records that would aid the plaintiff in pleading demand futility in a to-be-amended complaint in a plenary derivative action, when the earlier-filed plenary complaint was dismissed on demand futility-related grounds without prejudice and with leave to amend."); *see also Amalgamated Bank v. NetApp, Inc.,* 2012 WL 379908, at *7 (Del.Ch. Feb. 6, 2012) (recognizing limitation of *King II* to without-prejudice dismissals in which stockholder-plaintiff could re-file). Because *King II* permits a derivative plaintiff to use Section 220

time, the Delaware Supreme Court acknowledged the policy concerns that animated Chancellor Strine's decision. *King II*, 12 A.3d at 1150–51. Rather than addressing the first-to-file problem through the proper purpose requirement of Section 220, however, the Supreme Court suggested that "appropriate remedies are available in the plenary court" and that "[o]ne possible remedy for a prematurely-filed derivative action might be for the plenary court to deny the plaintiff 'lead plaintiff' status in such circumstances." *Id.* at 1151.

Similarly in *White I*, Vice Chancellor Lamb suggested that a plaintiff's failure to obtain books and records could be taken into account when evaluating whether a complaint's allegations were sufficiently particularized to satisfy Rule 23.1. *See* 793 A.2d at 364 (stating that because the plaintiff failed to use Section 220, "I will not give a broad reading to the facts alleged in the complaint, nor will I infer from them the existence of other facts that would have been proved or disproved by a further presuit investigation"). On appeal, the Delaware Supreme Court rejected this approach as inconsistent with Rule 23.1, but observed that "[t]he Court of Chancery was certainly justified in chastising the plaintiff for his lackluster pre-suit efforts." *White II*, 783 A.2d at 549. Chancellor Chandler tried again in *Beam v. Stewart*, where he suggested that Delaware Supreme Court decisions interpreting Rule 23.1 were "wholly consistent with [*White I*'s approach of] not giving 'a broad reading to the facts alleged in the complaint.'" *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 982 n. 66 (Del.Ch.2003) ("*Beam I*"), *aff'd on other grounds*, 845 A.2d 1040 (Del.2004) ("*Beam II*"). He further sug-

gested that "one might argue that following [*White I*'s] interpretive suggestion would be a reasonable method to further the Supreme Court's desire to encourage the use of § 220." *Id.* On appeal, the Delaware Supreme Court affirmed the dismissal of the complaint but reiterated that "[a] plaintiff's use of, or failure to use, a books and records inspection does not change the standard to be applied to review of the complaint." *Beam II*, 845 A.2d at 1057 n. 52. The Supreme Court nevertheless "agree[d] with the Chancellor's point about cost and drain on resources in weak cases where the plaintiff does not seek books and records." *Id.*

### d. Applying The Fast–Filer Presumption

In *Rales*, the Delaware Supreme Court made clear that "[n]othing requires the Court of Chancery, or any other court having appropriate jurisdiction, to countenance [fast-filing] by penalizing diligent counsel who has employed [investigative] methods, including section 220, in a deliberate and thorough manner in preparing a complaint that meets the demand excused test of *Aronson*." 634 A.2d at 934 n. 10; *see also King II*, 12 A.3d at 1151 (suggesting denial of lead plaintiff status as remedy for fast-filed derivative action). In my view, a court in a plenary derivative action such as this one has discretion to address a rush to the courthouse by determining that the plaintiff in the original derivative action did not provide adequate representation for the corporation and declining on that basis to give preclusive effect to a Rule 23.1 dismissal of the fast-filer's complaint. In this case, to give preclusive effect to the California Judgment would favor the lawyers who filed hastily, penal-

---

after a without-prejudice dismissal, Rule 15(aaa) now has the unfortunate side effect of encouraging plaintiffs to file derivative ac-

tions in courts that lack a similar rule and favor without-prejudice dismissals.

ize the diligent counsel who used Section 220, and confer a case-dispositive advantage on the defendants at the potential expense of the corporation.

The origins of this case exemplify the race-to-the-courthouse problem. Less than 48 hours after Allergan announced its settlement, LAMPERS filed the first derivative complaint, without using Section 220, without conducting any serious investigation, and without any meaningful allegations that could defeat a demand-futility motion. Within weeks, three comparably scant complaints had been filed in the California Federal Court. These prematurely filed complaints were filed hastily for one reason only: to enable the specialized law firms to gain control of a case that could generate legal fees.

Fast-filing might have benefited the specialized law firms, but it did not benefit Allergan. The complaints forced Allergan to fund the teams of the lawyers hired by the individual defendants to respond in each jurisdiction, address coordination issues, and brief parallel motions to dismiss. The fast-filed complaints also forced two separate court systems to expend judicial resources on the litigation. Ironically, when one stockholder—UFCW—attempted to proceed properly by using Section 220, the defendants *and the fast-filing Delaware plaintiff* joined forces to oppose its effort to develop the facts needed to plead a complaint with a meaningful chance of success.

By leaping to litigate without first conducting a meaningful investigation, the California plaintiffs' firms failed to fulfill the fiduciary duties they voluntarily assumed as derivative action plaintiffs. Rather than seeking to benefit Allergan, they sought to benefit themselves by rushing to gain control of a case that could be harvested for legal fees. In doing so, the

fast-filing plaintiffs failed to provide adequate representation.

Subsequent events did not transform the fast-filing plaintiffs into adequate representatives. True, the defendants voluntarily provided the California plaintiffs with the Section 220 materials, after UFCW invested the time and resources to obtain them, and the California plaintiffs used the materials to file an amended complaint. But in my view, the fast-filing plaintiffs already had shown where their true loyalties lay. Asking for and receiving the benefit of another lawyer's work did not rehabilitate them. It rather evidenced their continuing desire to control the case. In this regard, I disagree that the policy goal of encouraging plaintiffs to use Section 220 will not be undercut by a rule that affords priority to fast filers if the corporation gives them the same books and records that a diligent stockholder fought to obtain. *But see Career Educ.*, 2007 WL 2875203, *10 n. 58 (asserting that policy of encouraging stockholders to use of Section 220 would not be undercut by allowing fast-filing plaintiffs to copy complaint prepared by stockholder who used Section 220 and then giving preclusive effect to dismissal in fast-filed action). Under the rule enunciated in *King I*, the issue would not arise because stockholders like the California plaintiffs would not be able to file fast, suffer dismissal, and then ask for books and records to try again.

Assuming *LeBoyer* accurately states the law of collateral estoppel as I am bound to apply it (a point with which I disagree), the doctrine does not require dismissal in the current case because the plaintiffs in the California Action provided inadequate representation for Allergan. Rather than representing the best interests of the corporation, the California plaintiffs sought to maximize the potential returns of the spe-

cialized law firms who filed suit on their behalf.

## B. Rule 23.1

Having determined that collateral estoppel does not require judgment for the defendants, I must consider independently whether Rule 23.1 requires dismissal. Although not binding, the California Judgment is potentially persuasive.

Rule 23.1 requires that a derivative plaintiff "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Ct. Ch. R. 23.1. For a board to consider a demand properly, a majority of the directors must be able to exercise their independent and disinterested business judgment about whether to pursue litigation. *Aronson*, 473 A.2d at 815. The Delaware plaintiffs contend that demand should be excused as futile because each of the directors would face a substantial risk of liability if the litigation were pursued.

■ The requirement of factual particularity does not entitle a court to discredit or weigh the persuasiveness of well-pled allegations. "The well-pleaded factual allegations of the derivative complaint are accepted as true on such a motion." *Rales*, 634 A.2d at 931. "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged...." *Brehm*, 746 A.2d at 255. Put differently, once a plaintiff pleads particularized allegations, then the plaintiff is entitled to all "reasonable inferences [that] logically flow from particularized facts alleged by the plaintiff." *Beam II*, 845 A.2d at 1048. Rule 23.1 requires that a plaintiff allege specific facts, but "he need not plead evidence." *Id.* at 816; *accord Brehm*, 746 A.2d at 254 ("[T]he plead-

er is not required to plead evidence...."). A plaintiff also need not "plead particularized facts sufficient to sustain a 'judicial finding' either of director interest or lack of director independence" or other disabling factor. *Grobow*, 539 A.2d at 183. The Delaware Supreme Court in *Grobow* interpreted the Court of Chancery as having adopted a "judicial finding" standard and explicitly rejected it as "an excessive criterion" for pleading under the "reasonable doubt test." *Id.*

■ Similarly, to show that a director faces a "substantial risk of liability," the plaintiff does not have to demonstrate a reasonable probability of success on the claim. In *Rales*, the Delaware Supreme Court rejected such a requirement as "unduly onerous." 634 A.2d at 935. "The purpose of [Rule 23.1's] heightened standard is to ensure only derivative actions supported by a reasonable factual basis proceed." *Dow Chem.*, 2010 WL 66769, at *6. Plaintiffs need only "make a threshold showing, through the allegation of particularized facts, that their claims have some merit." *Rales*, 634 A.2d at 934.

■ In this case, the plaintiffs do not seek to impose liability on the Allergan directors for making a "wrong" business decision or taking imprudent business risks. *Cf. Citigroup*, 964 A.2d at 126 (dismissing *Caremark* claim premised on taking excessive risk); *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, *13–16 (Del.Ch. Oct. 12, 2011) (rejecting fiduciary duty claims based on alleged misalignment of interests created by compensation scheme). That type of "judicial second guessing is what the business judgment rule was designed to prevent." *Citigroup,* 964 A.2d at 126. "The business outcome of an investment project that is unaffected by director self-interest or bad faith, cannot itself be an occasion for di-

rector liability." *Gagliardi v. TriFoods Int'l Inc.,* 683 A.2d 1049, 1051 (Del.Ch. 1996) (Allen, C.) (footnote omitted).

Corporate misconduct involving fraud or illegality presents a different situation. Even under a pure *Caremark* monitoring theory,

> [t]here are significant differences between failing to oversee employee fraudulent or criminal conduct and failing to recognize the extent of a Company's business risk. Directors should, indeed must under Delaware law, ensure that reasonable information and reporting systems exist that would put them on notice of fraudulent or criminal conduct within the company. Such oversight programs allow directors to intervene and prevent frauds or other wrongdoing that could expose the company to risk of loss as a result of such conduct.

*Citigroup,* 964 A.2d at 131. "[I]mposing *Caremark*-type duties on directors to monitor business risk is fundamentally different from imposing on directors a duty to monitor fraud and illegal activity." *Goldman Sachs,* 2011 WL 4826104, at *22 (internal quotation omitted).

■ "Delaware law does not charter law breakers." *Massey Energy,* 2011 WL 2176479, at *20. "Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.'" *Id.* (citing 8 *Del. C.* §§ 101 & 102). "Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.,* 854 A.2d 121, 163–64 (Del.Ch.2004).

In short, by consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused. Although directors have wide authority to take lawful action on behalf of the corporation, they have no authority knowingly to cause the corporation to become a rogue, exposing the corporation to penalties from criminal and civil regulators. Delaware corporate law has long been clear on this rather obvious notion; namely, that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully. The knowing use of illegal means to pursue profit for the corporation is director misconduct.

*Desimone,* 924 A.2d at 934–35 (footnote omitted). "As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profits by violating the law." *Massey Energy,* 2011 WL 2176479, at *20.

■ The plaintiffs in this case have alleged a direct connection between the Board and a business plan premised on illegal activity. The Complaint pleads that from 1997 onward, the Board discussed and approved a series of annual strategic plans that contemplated expanding Botox sales dramatically within geographic areas that encompassed the United States. The plans contemplated new markets for Botox that involved applications that were off-label uses in the United States. So significant was the scope of the expansion that it necessarily contemplated marketing and promoting off-label uses within the United States. The Board then closely monitored Allergan's dramatic success in increasing its sales of Botox at rates far exceeding what the market for existing on-label uses could support or that could be generated by physicians serendipitously learning about and trying new off-label applications. The Board kept Allergan's business plan in

place even after the Schim incident and FDA inquiries illustrated the extent of Allergan's regulatory exposure. From these allegations, one can reasonably infer that the Board knowingly approved and monitored a business plan that contemplated illegality.

Critically, the Complaint does not merely allege that this misconduct took place. Unlike the parade of hastily filed *Caremark* complaints that Delaware courts have dismissed, and like those rare *Caremark* complaints that prior decisions have found adequate, the Complaint supports these allegations with references to internal Allergan books and records that UFCW obtained using Section 220. For example, the Complaint references a slide presentation to the Board that summarized the Strategic Plan for 1997–2001. The presentation projected ramping up Botox sales *in North America* from $86.1 million to $141.1 million. Plan Slides at 5. A slide entitled "Top Corporate Priorities" identified "Maximize New Products" as the second of three bullet points. *Id.* at 10. The fourth bullet point under the "Maximize New Products" heading read "BOTOX—Spasticity, migraine, and pain." *Id.* At the time, none were approved uses in the United States, which one can readily infer at the pleadings stage constituted a non-trivial part of the North American Botox-purchasing market.

Other slides in the deck provide further support for the inference that the Board-approved plan contemplated affirmative marketing and support for off-label uses. A slide described the "Charter" for the Botox "Business Portfolio Strateg[y]" *in North America* as "[i]nvest to grow new indications & develop follow-on toxins." *Id.* at 5. It listed "[s]pasticity," "[b]ack pain," and "[h]ead ache." *Id.* None were FDA-approved uses in the United States.

Another slide entitled "Transitioning to a Future with Sustainable Growth" stated:

- BOTOX®, Tazorac®, Alphagan®, and Array® represent immediate growth
- Major opportunities exist to expand into other specialty therapeutic areas with tremendous growth
  —*Back pain & head ache*
  —*Oncology*
  —*Diabetes*
- Expansion strategy enables Allergan to maximize Eye, Skin, & BOTOX® *now,* while establishing technology platforms to build our businesses in new areas.

*Id.* at 11. One can reasonably infer from these slides that the plan contemplated pursuing as "Top Corporate Priorities" new Botox uses not yet approved by the FDA as a source of "immediate growth" for Allergan and a means for "Allergan to maximize ... BOTOX® *now.*"

The text of Allergan's actual, written strategic plan expanded on the points identified in the slides. It identified "Maximize New Products" as the number 1 item on Allergan's list of six "Top Corporate Priorities." Written Plan at 14. The fourth bullet point under this number 1 item read: "*Botox*—Maximize sales for spasticity and new indications such as migraine." *Id.* Neither was an FDA-approved use. The section of the plan entitled "Corporate Portfolio Strategy" identified the "Role/Charter" for "*Botox*/Neuromuscular" as follows: "Invest to develop follow-on toxins with improved performance characteristics that protect and expand our toxin franchise. Sales expected to grow from $94 million in 1997 to $215 million in 2001." *Id.* at 22. The "Strategic Rationale" for this step was that

*Botox* will continue to be one of Allergan's fastest growing business areas as

usage expands to new indications and penetration expands in all regions. Investments in new indications of pain and migraine headache represent two of the top three future growth opportunities in our portfolio with combined peak year sales of $1.26 billion!

*Id.* One can reasonably infer that "all regions" included the United States, where "pain" and "migraine headaches" were off-label applications. *See also id.* at 3 (identifying Botox as one of "five core Allergan businesses" and describing the treatment as having "tremendous growth potential as we fund opportunities with new indications and uses such as spasticity, pain, migraine and tension headache").

Allergan's plan projected that the company would enter the "Migraine Headache" market in 2001 and achieve estimated peak-year, risk-adjusted sales of $596 million. *Id.* at 5. "Migraine headache" was an off-label use. The plan also projected that Allergan would enter the back pain market in 2002 and achieve estimated peak-year, risk-adjusted sales of $666 million. *Id.* "Back pain" was an off-label use.

The plan further anticipated that Allergan's sales growth would be driven in part by "continued growth from *Botox* " and that Allergan's improvement in gross profit margin would be "driven by changes in the sales mix as sales growth comes from higher priced and higher margin products such as *Alphagan, Botox,* and *Zorac.*" *Id.* at 8. The plan further noted that

Allergan is at the beginning of major new product launches with *Alphagan, Zorac,* the *Array* IOL and new indications for *Botox.* Each of these new product opportunities represents significant advances in technology which have the potential to change the way physicians approach the management of their patients' conditions. Also they all participate in relatively large markets. As

a result, there are best case scenarios for these products which are not prudent to include in our projections, but which do represent potential upside opportunities.

*Id.* at 9. The plan warned that Allergan was largely dependent on these products, and that "[t]he majority of Allergan's growth over the next five years is expected to come from *Alphagan, Array* IOL, *Zorac* and *Botox.*" *Id.* at 10.

As the Complaint alleges, Allergan pursued the Board's strategic plan by deploying an array of programs to support off-label Botox use. These efforts included sponsoring physicians to speak about and promote off-label use, assisting physicians in seeking reimbursement for off-label use, and providing pricing support to promote off-label use. The strategic plan specifically cited "U.S.-Reimbursement assistance" as one of the reasons *"Why Customers Buy From Us Now." Id.* at 59.

The Complaint pleads that the Board regularly monitored Botox sales and cites specific occasions where the Board was made aware of growth in average daily sales and the revenue mix across different usage categories. The Complaint specifically pleads that between 2000 and 2004, Botox achieved annual sales growth of 25% to 42%, despite being approved by the FDA for only four uses where demand was limited. Off-label sales skyrocketed with spasticity sales growing by 332%, headache sales by 1,407%, and pain sales by 504%. Although it is not the only possible inference, one can reasonably infer at the pleadings stage that the Board knew physicians were not harmonically converging on off-label uses in the same areas that Allergan happened to be targeting aggressively for sales growth.

The Complaint specifically pleads that in October 2006, the Board learned that the FDA was inquiring about off-label market-

ing by Dr. Schim, an Allergan-sponsored speaker. The Board was advised that the dinner programs at which Dr. Schim spoke were "directly funded, hosted, and controlled by Allergan," and that "the presentations are considered commercial promotion and Allergan is responsible for their content." German Aff. Ex. E. The Board was further advised that Allergan business and marketing personnel knew about Dr. Schim's non-compliant materials and failed to take responsibility for addressing his promotion of off-label uses. The directors were told by in-house counsel that "[t]his is a potentially serious matter and in the current environment, the chance of receiving Agency action, including but not limited to a Warning Letter, on this matter is ... very high." *Id.*

The Complaint pleads that after the Schim incident, the Board approved the 2007–2011 Strategic Plan which explicitly linked the number of sales representatives to increased off-label sales. During the same period, the Board continued to receive detailed reports on Botox sales and the revenue mix, including reports showing that 70% to 80% of Botox sales were generated from off-label use. These particularized allegations support a reasonable inference that the Board knew Allergan personnel were engaging in or turning a blind-eye towards illegal off-label market-

ing and promotion and that the Board nevertheless decided to continue Allergan's existing business practices in pursuit of greater sales.

Ten of the twelve defendant directors have served on the Board since 2005 and earlier. One can reasonably infer that these directors approved multiple iterations of Allergan's strategic plan, monitored Botox's explosive sales growth, learned of the Schim incident in October 2006, then approved the 2007 Strategic Plan, fully conscious of the role of off-label marketing in Allergan's success. The inference is more tenuous for Dunsire and Hudson, who joined the Board in 2006 and 2008, respectively. Because the Complaint implicates more than half of the Board, I need not make any determination one way or the other as to those two directors.

It is not unreasonable to infer that the Allergan Board, led by a hard-charging CEO who earned the nickname "Mr. Botox," could have believed that Allergan knew better than the FDA which Botox applications were safe, particularly off-label uses already approved (or at least permitted) in other countries. It is not unreasonable to infer that the Board and CEO saw the distinction between off-label selling and off-label marketing as a source of legal risk to be managed, rather than a boundary to be avoided.[33] Based on this

---

**33.** Others have embraced this view. *See, e.g.,* David L. Engel, *An Approach to Corporate Social Responsibility,* 32 Stan. L.Rev. 1, 34–55 (1979) (arguing that corporations can and should maximize profits by factoring in the cost of regulatory and legal sanctions discounted by likelihood of detection and successful enforcement); Frank H. Easterbrook & Daniel R. Fischel, *Antitrust Suits by Targets of Tender Offers,* 80 Mich. L.Rev. 1155, 1168 n.36 (1982) (asserting that "[m]anagers have no general obligation to avoid violating regulatory laws, when violations are profitable to the firm."); *id.* at 1177 n. 57 (asserting that "managers do not have an ethical duty to obey economic regulatory laws just because

the laws exist. They must determine the importance of these laws. The penalties Congress names for disobedience are a measure of how much it wants firms to sacrifice in order to adhere to the rules; the idea of optimal sanctions is based on the supposition that managers not only may but also should violate the rules when it is profitable to do so."). *See generally* Cynthia A. Williams, *Corporate Compliance With the Law In the Era of Efficiency,* 76 N.C. L.Rev. 1265, 1285–1300 (1998) (collecting and summarizing authorities endorsing the view of "law-as-price"). Delaware law explicitly rejects the notion that a board of directors can act loyally by con-

premise, the CEO and his management team devised, and the Board approved, a business plan that relied on off-label-use-promoting activities, confident that the risk of regulatory detection was low, that most regulatory problems could be solved, and that dealing with regulatory risk was a cost of doing business.[34] As profits increased and the regulatory risk seemed well managed, the extent of off-label use-promoting activities grew. The appearance of formal compliance cloaked the reality of non-compliance, and directors who understood the difference between legal off-label sales and illegal off-label marketing continued to approve and oversee business plans that depended on illegal activity. *See Massey Energy*, 2011 WL 2176479, at *19 (crediting inference that outside directors went "through the motions" rather than making "good faith efforts to ensure that [the company] cleaned up its act").

Obviously this is not the only inference that can be drawn. Alternatively, one could infer that the directors received advice from sophisticated counsel about the difference between legal off-label sales and illegal off-label marketing, understood where the boundary lay, and approved a business plan and management initiatives in the good faith belief that Allergan was remaining within the bounds of the law, although perhaps close to the edge. The directors then closely monitored Allergan's

performance with this understanding. Unfortunately for everyone, the directors' good faith belief proved incorrect, and Allergan pled guilty to criminal misdemeanor misbranding for the period from 2000 through 2005, paid criminal fines of $375 million, and paid another $225 million in civil fines. If this scenario proves true, then the directors will not have acted in bad faith and will not be liable to Allergan for any of the harm it suffered. *See id.* at *22.

I cannot presently determine what actually happened at Allergan. I hold only that a reasonable inference can be drawn from the particularized allegations of the Complaint and the documents it incorporates by reference that the Board knowingly approved and subsequently oversaw a business plan that required illegal off-label marketing and support initiatives for Botox. At this stage of the case, I must credit this inference, even if I believe it more likely that the directors acted in good faith. The complaint need not "plead particularized facts sufficient to sustain 'a judicial finding' either of director interest or lack of director independence" or other disabling factor. *Grobow*, 539 A.2d at 183. Nor must it demonstrate a reasonable probability of success. *Rales*, 634 A.2d at 934–35. The complaint needs only to make a "threshold showing, through the allegation of particularized facts, that their

---

sciously deciding to violate positive law in pursuit of greater profits. *See* Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 649 (2010).

34. *See* Williams, *supra*, at 1279–80 ("[P]art of the calculation to violate the law includes a calculation of the probability that the violation will go undetected; or if detected, that it will go unprosecuted for any one of a plethora of reasons; or if prosecuted, that liability will not be established; or if liability is estab-

lished, that the penalty will be lower than the profits obtained; or that the penalty will not be upheld on appeal in any event. Moreover, the probabilities at each of these stages can be, and in many cases will be, driven downward by actions by the corporation and the corporation's lawyers. So, although the theory may treat the question as one of violating a law deliberately and paying the penalty, the reality is that of risking paying a penalty at best." (alterations, footnote, and internal quotation omitted)).

claims have some merit." *Id.* at 934. I believe the Complaint meets this standard.

In reaching this conclusion, I part company with the California Federal Court and find unpersuasive the analysis in the California Judgment. The California Federal Court correctly described Delaware law in stating that that the California complaint only could survive a Rule 23.1 motion to dismiss if the particularized allegations presented the directors with a substantial threat of liability. The California Federal Court nevertheless determined that the California complaint failed to meet this test.

The California Federal Court held that the California complaint fell short because "[t]here is still no evidence of a *decision* by board members to promote the use of off-label marketing, nor are there any facts suggesting that the Directors would be incapable of making an impartial decision concerning litigation. The 1997–2001 Strategic Plan makes no mention of off-label marketing." California Judgment at 4. The California Federal Court stated that the "Top Corporate Priorities" slide listed bullet points, "the first of which does not even mention Botox." *Id.* As the California Federal Court recognized in denying the plaintiffs' motion for reargument, the fourth bullet point identified Botox as one of four products the sales of which Allergan sought to maximize. *In re Allergan Inc. S'holder Deriv. Action*, Case No. SACV 10–1352, at 3 (C.D.Cal. Feb. 22, 2012). As discussed above, the underlying written plan identified "Maximize New Products" as the number 1 item on Allergan's list of six "Top Corporate Priorities." German Aff. Ex. D at 14. The fourth bullet point under this number 1 item reads: "*Botox*—Maximize sales for spasticity and new indications such as migraine." *Id.* Neither was an FDA-approved use.

In my view, a plaintiff does not have to point to actual confessions of illegality by defendant directors to survive a Rule 23.1 motion in a *Caremark* case. Particularly at the pleadings stage, a court can draw the inference of wrongful conduct when supported by particularized allegations of fact.[35] Given that off-label marketing is illegal, it would be astounding if the 1997–2001 Strategic Plan or any other board presentation actually used that term. If in-house counsel hoped to keep their jobs, those words only could make it into a board presentation in the context of a statement against the practice. But sadly, sophisticated corporate actors at times engage in illegal behavior and attempt to hide their misconduct with the appearance of legal compliance. Having reviewed the summary slides and the underlying strategic plans, I believe there are sufficient references in the documents to support a reasonable inference that Allergan expected to drive increased sales by promoting off-label use. When, as here, the pled

---

[35]. *See, e.g., Massey Energy*, 2011 WL 2176479, at *19 ("Although the defendants point to a lot of motion by the independent directors, some of which resulted from a 2008 court-ordered settlement, the plaintiffs in turn point to evidence creating a plausible inference that the independent directors of Massey did just that—go through the motions—rather than make good faith efforts to ensure that Massey cleaned up its act."); *Saito*, 2004 WL 3029876, at *7 (denying Rule 23.1 motion to dismiss *Caremark* claims where "[p]laintiffs allege well-pled facts sufficient to infer that separately, both the HBOC and McKesson boards were aware (or should have been) of accounting irregularities at HBOC."); *cf. Am. Int'l Gp.*, 965 A.2d at 795 (drawing the "very plausible inference" that "those who engage in sophisticated forms of financial fraud do their best not to leave an obvious paper trail" but rather "try to conceal their roles and not leave marked paths leading to their doorsteps").

facts can support a reasonable inference that directors *in fact* approved a business plan that contemplated off-label marketing, the plaintiffs receive the benefit of the inference at the pleadings stage.

The California Federal Court similarly concluded that a Board-sanctioned "Headache Development" program for Botox "had absolutely nothing to do with marketing; rather, it was a clinical presentation regarding Botox's potential efficacy in treating migraines." California Judgment at 4. The California Federal Court likewise dismissed the sufficiency of the allegation that the Board oversaw a "Cervical Dystonia/Headache Expansion Initiative" by noting that cervical dystonia was an approved FDA use at the time. *Id.*

In my view, both descriptions adopt one possible and defendant-friendly interpretation of the underlying documents and related allegations. At the pleadings stage, I believe the plaintiffs are entitled to the reasonable inference that the Board oversaw company-wide efforts to promote off-label use of Botox for treating migraine headaches, which was not an FDA-approved use at the time.

The California Federal Court also held that the Board's knowledge of the Schim incident did not demonstrate wrongdoing by the Board. According to the California Judgment, "[n]ot only was the presentation approved prior to the presentation without the offending slides, but the Directors took appropriate remedial action after learning of the presentation." *Id.* (citing defendants' motion). Whether the directors took "appropriate remedial action" is unclear and strikes me as a factual issue that reasonably could be disputed at this stage of the case. Regardless, as I understand the plaintiffs' theory, the argument is not that the Schim incident itself established wrongdoing. The point rather is that the Schim incident should have

further illuminated the serious legal risks posed by Allergan's various programs for supporting off-label use, including its sponsored-speaker program, and the existence of a culture of non-compliance at the company. Despite being confronted with this red-flag, the directors subsequently approved iterations of the business plan that further ramped up Allergan's support for off-label use. It may be that the directors in fact acted in good faith after the Schim incident and when taking these steps, but at the pleadings stage I do not believe that I can adopt a defendant-friendly interpretation of the plaintiffs' allegations.

As should be abundantly clear, this is a pleadings-stage decision. To prevail ultimately, the plaintiffs actually will have to prove their claims. At later stages of the case, the plaintiffs will not be entitled to pleadings-stage presumptions, and the defendants will have strong arguments against liability. *See Massey Energy,* 2011 WL 2176479, at *20–21. For present purposes, however, the plaintiffs need only plead particularized allegations that support a reasonable inference that their claims have "some merit." *Rales,* 634 A.2d at 934. Because the plaintiffs have met this standard, the Rule 23.1 motion is denied.

### C. Rule 12(b)(6)

"The standard for pleading demand futility under Rule 23.1 is more stringent than the standard under Rule 12(b)(6)...." *Citigroup,* 964 A.2d at 139. A complaint that pleads a substantial threat of liability for purposes of Rule 23.1 "will also survive a 12(b)(6) motion to dismiss." *McPadden v. Sidhu,* 964 A.2d 1262, 1270 (Del.Ch.2008). Accordingly, the Rule 12(b)(6) motion is denied.

### III. CONCLUSION

As Chancellor Allen famously observed, a *Caremark* theory "is possibly the most

difficult theory in corporation law upon which a plaintiff might hope to win a judgment." 698 A.2d at 967. But "difficult" does not mean "impossible," and "win a judgment" does not mean "survive a motion to dismiss."

Under my understanding of controlling Delaware Supreme Court precedent, collateral estoppel does not mandate dismissal. Separately and independently, by filing hastily and failing to conduct a meaningful investigation, the California plaintiffs acted self-interestedly and contrary to Allergan's best interests. They did not provide adequate representation, rendering collateral estoppel inapplicable.

On the merits of the Rule 23.1 motion, the California Judgment is not persuasive because it adopts one possible defendant-friendly inference from the pled facts. Even under Rule 23.1, the plaintiffs receive the benefit of reasonable inferences that can be drawn from adequately pled facts. Here, the particularized allegations support a reasonable inference that the Board knowingly approved a business plan that contemplated illegal off-label marketing in the United States. The particularized allegations of the Complaint, which are supported by internal documents obtained through Section 220, present a substantial threat of liability for all but two members of the Board.

Demand is therefore excused as futile. For the same reasons, the Complaint states a claim under Rule 12(b)(6). The motions to dismiss are denied. IT IS SO ORDERED.